Frank E. BERMAN et al.

v.

The NEW HAMPSHIRE JOCKEY
CLUB, INC.

Frank E. BERMAN et al.

v.

NARRAGANSETT RACING ASSO-
CIATION, Inc.

Frank E. BERMAN et al.

v.

BURRILLVILLE RACING
ASSOCIATION.

Civ. A. Nos. 2855, 3200 and 3201.

United States District Court,
D. New Hampshire.

March 24, 1971.

See also D.C., 48 F.R.D. 333.

J. Fleet Cowden, Boston, Mass., for plaintiffs.

Kenneth F. Graf, Arthur A. Greene, Jr., and Charles A. De Grandpre, McLane, Carlton, Graf, Greene & Brown, Manchester, N. H., for N. H. Jockey Club, Inc.

Stephen F. Achille, Providence, R. I., for Narragansett Racing Assn., Inc.

William A. Curran, Jordan, Hanson & Curran, Providence, R. I., for Burrillville Racing Assn.

## OPINION

BOWNES, District Judge.

This is a class action instituted by Frank E. Berman, Rose R. Berman, and Muriel Winston on behalf of themselves and all horse owners similarly situated against the New Hampshire Jockey Club, Inc. (owner of Rockingham Park, Salem, New Hampshire), Narragansett Racing Association, Inc. (owner of Narragansett Park, Pawtucket, Rhode Island), and the Burrillville Racing Association (owner of Lincoln Downs, Lincoln, Rhode Island). The cases were consolidated for trial since the facts are essentially similar and the issues of law identical. Jurisdiction is founded on diversity of citizenship. The case was tried without a jury. The validity of the class action is not at issue here since the First Circuit Court of Appeals has held that this action is a proper class action within Rule 23 of the Federal Rules of Civil Procedure. Berman v. Narragansett Racing Association (Berman v. Burrillville Racing Association, Berman v. New Hampshire Jockey Club, Inc.), 414 F.2d 311 (1st Cir. 1969), cert. den., 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970).

The issue is whether the defendant race tracks have wrongfully withheld, from the horse owners who won purses, a share of a specific portion of the monies bet during the period from 1959 to 1969 in breach of agreements between the defendants and the horse owners. The plaintiffs claim that they are owed a percentage of the "breakage" retained by the defendants over this ten year period.

Because of the special terms and unique jargon employed in the sport of kings, a detailed examination and explanation of how the defendant tracks operate under the Pari-Mutuel Pool System is necessary.

### The Distribution Of The Handle Between The Tracks And The States

It should be noted that this case deals only with so-called "flat" or "running" racing, i. e., horses ridden by jockeys. Harness racing, i. e., trotters or pacers which pull sulkies, are not involved here.

The money wagered by bettors at the track is termed "handle" or "mutuel handle." The patrons pay increments of $2.00 for tickets on a particular horse, specifying whether that horse will win the race, finish second (place), or finish third (show). The total amount of these bets is termed the "handle" for that particular race. The "daily handle" is the total amount of money wagered on every race run on a particular day. The "meet handle" is the total amount wagered on every race run during the entire session which, although varying

from track to track, averages about sixty-five racing days per year.

The distribution of the handle among the track, the state, and the winning ticket holders is governed by state statutes. Under the Rhode Island statutes, the state took as a tax a sum equal to 8% of the mutuel handle plus one-half of the "breakage" from 1959 to 1963, and a sum equal to 8½% of the mutuel handle and one-half of the "breakage" from 1964 to 1969.[1] The New Hampshire statutes provided that the state was entitled to 7% of the mutuel handle plus one-half of the "breakage" from 1959 to 1967 and to 7½% of the mutuel handle plus one-half of the "breakage" from 1967 to 1969.[2]

One important factor in this case is the meaning and affect of the tracks' (licensee's) "commission" as defined by statute. Lincoln Downs and Narragansett Park are governed by R.I.Gen.Laws, Sec. 41–4–4 (1964), as amended, which provides:

41–4–4. Licensee's commission under pari-mutuel system.—Each licensee under the pari-mutuel system may retain as such licensee's commission,

(a) not to exceed seven and one-half percent (7½%) of the total amount of money wagered on such events, and

(b) one-half (½) of the breakage to the dime resulting from such wagering.

This commission was in effect from January of 1964 to 1969. From 1959 to 1964, Narragansett and Lincoln Downs were entitled to 7% of the handle and one-half of the breakage. R.I.Gen.Laws, Sec. 41–4–4 (1958). Rockingham Park's commission between 1967 and 1969 was governed by N.H.Rev.Stat.Ann., Ch. 53:1 (1967), amending N.H.Rev.Stat. Ann., Ch. 284:22 (1961):

I. Commissions on such pools at tracks or race meets conducting a running horse race or running horse meet shall be uniform throughout the state at the rate of fifteen per cent of each dollar wagered plus the odd cents of all redistribution to be based upon each dollar wagered, exceeding a sum equal to the next lowest multiple of ten, known as "breakage," one-half of which breakage shall be retained by the licensee and the balance shall be paid to the state treasurer for the use of the state in accordance with the provisions of section 2. Said maximum shall include the seven and one-half per cent tax hereinafter prescribed.

The practical interpretation of this provision is that Rockingham was entitled

---

1. Rhode Island Gen.Laws, Sec. 41–4–3 (1964) provides:

Tax on pari-mutuel betting.—Each licensee conducting racing events under the pari-mutuel system shall pay to the state, and there is hereby imposed,
(a) a tax at the rate of eight and one-half percent (8½%) of the total amount of money wagered on such events, and
(b) a tax equal to one-half (½) of the breakage to the dime resulting from such wagering.
Prior to 1964, the language of the statute was exactly the same except the percentage in subsection (a) was eight percent (8%). See R.I.Gen.Laws § 41–4–3 (1958).

2. New Hampshire Rev.Stat.Ann. Chapter 284:23 (1967) provided in part:
I. Each person, association or corporation licensed to conduct a running

horse race or running horse meet under this chapter shall pay to the state treasurer a sum equal to seven and one-half per cent of the total contributions to all pari-mutuel pools * * *.
Prior to 1967 the language of the statute was exactly the same except the percentage was seven percent. See N.H. Rev.Stat.Ann. Ch. 284:23 (1959). In 1970, the percentage was increased to 8%. See N.H.Rev.Stat.Ann. Ch. 284:23 (1970).
The tax on breakage is governed by N.H. Rev.Stat.Ann. Ch. 284:22 (1967) which provides in part:

I. * * * the odd cents of all redistribution to be based upon each dollar wagered, exceeding a sum equal to the next lowest multiple of ten, known as "breakage," one-half of which breakage * * * shall be paid to the state treasurer for the use of the state * * *.

to 7½% of the handle plus one-half of the "breakage." From 1959 through 1966, Rockingham's commission was 7% plus one-half of the "breakage."

For purposes of explanation, it will be assumed that the three defendant tracks were entitled to 7½% of the handle plus one-half of the "breakage" and that the states were entitled to the same share. The procedure by which the monies were divided between the state, the track, and the winning ticket holders may be illustrated as follows. Assume that the patrons place bets on a given race of $100,000. This $100,000 is termed the handle of the race. The state is entitled to 7½% of the $100,000 handle or $7,500 as a tax. The track is also entitled to 7½% ($7,500) of the $100,000 handle as its statutory commission. Fifteen percent, or $15,000, is, therefore, taken out to be divided between the state and the track (sometimes referred to as "total take out"). The name which should be applied to the tracks' 7½% share is in dispute, but it is sometimes called "track take out," "track commission," or "track take." The remaining 85% of the handle, here $85,000, is allocated to the win, place, and show pools for division among those holding tickets on horses finishing first, second, and third.

It is at this point that "breakage" arises. After the race, the amount in each pool is divided by the number of winning tickets. The statutes provide that the winning ticket holders are to be paid to the next lowest dime.[3] If, therefore, the quotient resulting from the division of the particular pool by the number of winning tickets is $5.44 for each two dollar ticket, the actual amount paid is $5.40. The four cents is termed breakage and is divided equally between the state and the track. The amount of

breakage is substantial; for the ten years in question (1959–1969), the three tracks' one-half share of the breakage approximated nine million dollars.

### The Agreements Between The Tracks And The Horse Owners

In order to induce horse owners to enter races and to apprise them of certain track rules, the tracks publish one or more condition books for each racing meet. Pl. Ex. 3 and 31. These condition books are printed by the tracks before and during a racing meet. The condition books set forth, on a day by day basis, the number of races to be run, the requisite qualifications of the horses eligible for each race, the total purse payable to purse winners in each race, and other information. The purse listed in the condition book is split between the owners of the first five or six finishing horses in a given race depending on the race track and year in question. These owners are termed purse winners. The amount of the purse and the requisite qualifications of the horses were, in most cases, the basis of the horse owner's decision to enter his horse in a particular race.[4]

Prior to 1959, the total amount of the purses was determined by purse agreements between the defendants and the horse owners based on a straight percentage of the handle. After 1959, the agreements were based on a percentage of the "track take." The dispute in this case centers on the interpretation of the post 1959 agreements. As will become evident later, the purses specified in the condition books are only projections of the tracks' obligations to the purse winners based on an estimate of the meet handle since, of necessity, the condition books are published and distributed prior to the racing meet.

3. See Footnotes 1 and 2, *supra*, p. 1159.

4. Mr. Moray, a witness called by the plaintiffs, stated:
 I'd examine the condition book, look at the purse structure, not the purse structure, but the purses that they were paying, and then go where I figured my horses belonged. And I didn't even, I knew the money came from the bettors; that's all I ever knew about it. Transcript, p. 787.

## The Horsemen's Benevolent And Protective Association

To understand the purse agreements between the defendant tracks and the horse owners, a detailed discussion of the negotiating process is required. The evidence presented at trial indicates that sometime in 1940 or 1941, an organization known as the Horsemen's Benevolent and Protective Association (HBPA) was formed. This organization was originally started, according to one witness, to retire and destroy aging racehorses.[5] Over a period of years, however, the HBPA took on the functions of representing the horse owners in grievances about conditions at the tracks, paying hospital and medical benefits to the horse owners, and negotiating the purse agreements between the tracks and the horse owners. Although the HBPA is a national organization, the New England Division of the HBPA negotiated the purse agreements with the defendants. The New England Division of the HBPA has always maintained an office with regular hours at each of the defendant tracks during a racing meet. For the past five or six years, the HBPA has had two trailers at the defendant tracks when a meet is in progress. The trailers are clearly marked and open to the horse owners at all times. The National HBPA has published and distributed to horse owners a free magazine known as the Horsemen's Journal since 1952.

Membership in the HBPA is automatic, i. e., when one receives a license to train or race horses, he automatically becomes a HBPA member. The horse owners pay dues to the HBPA in an indirect manner. The initial practice of the HBPA was to have the track deduct 1% (not exceeding $25) from the purse paid to the owner of the horse finishing first in a given race. Although the testimony is not clear on when this procedure was changed, the Rockingham Park Distribution Sheets (Pl. Ex. 2) establish that at least since 1958, the HBPA has received 1% of the purse money "off the top." As to Narragansett and Lincoln Downs, it was sometime between 1958 and 1960 when the HBPA received 1% of the total purses payable to the purse winners. If, therefore, the total purses payable under the purse agreement for a given meet were $300,000, the HBPA was entitled to $3,000 and the purse winners to $297,000. In addition, sometime between 1958 and 1960, the tracks began paying over to the HBPA the money received from the $10 "pony lead fees" paid by many horse owners to have a pony lead their horses from the paddock to the post (starting gate). The president of the New England Division of the HBPA testified that the HBPA requested that the tracks turn over the pony lead fees because the HBPA did not have sufficient funds to pay the hospital and medical bills of the horse owners and would have to turn these bills over to the tracks in the absence of more funds. Testimony of Max White, Transcript, p. 658.

## The Purse Agreements

From 1959 to 1969, the HBPA negotiated the purse agreements with the defendant tracks as the bargaining agent for the horse owners, and counsel for plaintiffs conceded this in his closing argument. Transcript, p. 974. The evidence discloses that these negotiations were informal and that most agreements between the defendant tracks and the horse owners were oral because this had been the practice for many years. Prior to 1959, the agreement between the track and the horse owners provided that the horse owners would receive 3.-1% of the mutuel handle. Under this formula, if patrons wagered $100,000 on a race, the horse owners were entitled to a purse of 3.1% of the $100,000 or $3,-100. Under this formula, no question of breakage arises since the formula is based on the total mutuel handle, not on the tracks' commission or share of the handle.

5. Testimony of Mr. Moray, Transcript, p. 788.

To implement this agreement with the horse owners, the tracks would estimate the total handle of the meet and establish the purses published in the condition books. The tracks then kept daily purse distribution sheets comparing the actual purses paid to the purses that should have been paid. Pl. Ex. 2, 30, and 37. If the handle did not meet the tracks' estimates, the purses actually paid would exceed the purses required under the purse agreement. This excess is termed "overage." If, on the other hand, the handle exceeded the tracks' estimates, then the purses actually paid would be less than that required by the purse agreement. This shortage is termed "underage."

The following example illustrates the overage and underage procedure. Assume the total handle for a given meet is $10,000,000. Under the 3.1% formula, the horse owners were entitled to 3.1% of this total handle or $310,000. If the purses published in the condition books and actually paid to the purse winners total $300,000, then a $10,000 "underage" results, meaning that the track owes $10,000 to the horse owners. If, on the other hand, the purses published in the condition books and actually paid during the meet total $350,000, an "overage" results because the track has overpaid by $40,000. The purse distribution sheets kept by the tracks gave the daily "overage" or "underage" and the purses might be decreased or increased during the meet to bring the estimates in line with the obligations of the purse agreements. If there was an "overage" or "underage" for the entire meet, the general practice was to carry it forward to the following meet. An "overage" of $15,000 would reduce the purses to be paid to the horse owners the following year by that amount. If there was a $15,000 "underage," then the track usually increased the purses during the next meet by that amount. If a substantial underage existed at the end of a meet, the track might pay this amount directly to the purse winners as a "bonus." The estimation of purses

and the "overage" and "underage" procedure was continued during the years 1959 through 1969.

In 1959, however, the 3.1% of the total handle formula was abandoned. The interpretation of the new formula is the basis for this litigation. In 1959, a meeting was held at Suffolk Downs between the purse committee of the New England Division of the HBPA and the management of Rockingham Park, Narragansett Park, Lincoln Downs, and Suffolk Downs. At this meeting, it was agreed that the purse formula should be changed in some manner so as to increase the dollar amount of the purses paid. During the meeting, or shortly thereafter, the HPBA negotiated purse agreements with the defendant tracks individually. Transcript, p. 639. Although the 1965 edition of the constitution and by-laws of the HBPA specify that each contract be in writing, Max White, the chairman of the New England HBPA purse committee, testified that most of the agreements with the defendants were oral since this had been the practice for many years and the defendants had always abided by the agreements. Transcript, p. 644. The agreements were renewed on a yearly basis with the individual tracks.

Two written contracts, however, were introduced as evidence: one between the HBPA and Rockingham Park dated 1962; and the other between Lincoln Downs and the HBPA dated the same year. Pl. Ex. 1 and 35. These two contracts stated that for 1962, Rockingham and Lincoln Downs agreed to pay 44.7% and 45.7% respectively of the "track take from the mutuel handle" to the horse owners in purses. Based on the testimony of Max White, I find that the language "track take of the mutuel handle" or "track take" was used in every agreement entered into by the HBPA and the defendants between 1959 and 1969. There is no evidence that the term "commission" was ever used in these agreements. An examination of the purse distribution sheets of the three tracks evinces that between 1959

and 1969, the percentage paid by the defendants ranged between 42% and 45.7% of "track take" as interpreted by the defendants. Pl. Ex. 2, 30, and 37.

For purposes of illustration only, it will be assumed that all three tracks were required to pay 45.7% of the "track take." It was stipulated by the parties that the defendants applied the 45.7% to their statutory percentage share of the mutuel handle, but not to the breakage. In other words, if the handle was $100,000, the defendants first computed their 7½% statutory share, or $7,500. The defendants used this figure as "track take." The defendants then took 45.7% of this 7½% ($7,500) to determine the horse owners' share under the purse agreements. Under the example given, this amount would be $3,427.50. From this amount, the defendants would deduct the 1% "off the top" payment to the HBPA ($34.28) leaving a net to the purse winners of $3,393.22.

Counsel for the plaintiffs intimates that the change in the formula from 3.1% of the mutuel handle to 45.7% of "track take" was to confuse the horse owners and to conceal the actual practice of the defendants from them. The change may have been confusing to some, but involved no concealment. Max White testified that the New England Division of the HBPA's major goal was to get more money and "we wanted to try a new formula." Transcript, p. 639. From the testimony of Mr. Manfuso, the national president of the HBPA, it is apparent that the practice of the HBPA national organization was to express the purse winners' share as a percentage of "track take." It is hardly coincidental that the 45.7% of track take adopted by the New England Division of the HBPA as its formula in 1959 also represented the national average in that year. See Transcript, p. 639.

If there was any confusion on the part of some horse owners as to the new formula, it may have been due to the fact that the amount of the purses was computed by at least one of the defendants in terms of a percentage of the total handle instead of a percentage of the "track take." [6] Both methods, however, bring the same result. Assuming that the handle is $100,000, that the "track take" (statutory percentage of the handle) is 7%, and that the horse owners are entitled under the purse agreements to 45.7% of the "track take," the two methods may be illustrated as follows: (1) percentage of track take method— $100,000 x 7% = $7,000, $7,000 x 45.7% = $3,199; (2) percentage of handle method—45.7% x 7% = 3.199%, 3.199% x $100,000 = $3,199. It is apparent that the percentage of handle method simplifies computation since the 3.199% of the handle remains constant as long as the tracks' statutory percentage of the handle and the percentage of track take specified in the purse agreements remain the same.

Since the HBPA was entitled to 1% of the purses, the actual percentage of handle available for purse winners is 3.167% (3.199% minus 1% of 3.199%). Although the percentage increase over the 3.1% of the total handle formula is small (.00067%), the increase in terms of dollars is substantial. For example, total meet handle at Rockingham in 1964 was approximately $60,000,000. The increase from 3.1% to 3.167% results in $40,200 additional purse money ($60,000,000 x .00067%). Moreover, when the tracks' percentage share of the handle increases, the horse owners automatically benefit. When, for example, Narragansett's commission went from 7% to 7½% in 1965, the horse owners became entitled to 3.4275% of the handle (45.7% x 7.5%). Taking into account the HBPA's 1% share, the horse owners were then entitled to 3.39% of the han-

6. See Plaintiffs' Exhibit 37a wherein it is stated:

In our computations, we figure the percentage purse on percentage of handle

rather than percentage of commission. The result is identical, thusly: 44% x 7% = .0308%.

dle as compared to the old 3.1% formula. In terms of dollars, assuming a $60,000,000 handle for a racing meet, the purse winners would receive approximately $174,000 more than under the 3.1% formula ($60,000,000 x .0029%). These figures illustrate that the benefit to the horse owners was indeed significant in terms of dollars.

### RULINGS

■ The central issue is the plaintiffs' claim that they are entitled not only to 45.7% of the defendants' statutory percentage share of the mutuel handle, but also to 45.7% of the defendants' statutory one-half share of the breakage.

The parties have stipulated that the tracks have interpreted the purse agreements and, consequently, the term "track take" to mean that the horse owners were entitled to 45.7% of the tracks' 7½% statutory share of the mutuel handle excluding any breakage. The evidence also establishes that this same interpretation of "track take" was held by the purse committee of the New England Division of the HBPA which negotiated the purse agreements with the defendant tracks. Max White, president of the New England Division of the HBPA and chairman of the purse committee from 1959 through 1965, testified that the purse agreements were for a percentage of the defendants' share of the handle excluding breakage. He testified on direct examination:

Q. [By plaintiffs' counsel.] And by track take, what did you mean?

A. We meant the percentage they were getting from the state. At that time, I think it was 7 per cent.

\* \* \* \* \* \*

A. I am just taking about the per cent. We never discussed breakage.

Transcript, p. 640.

In an affidavit introduced as evidence, Gerald Colella, Max White's successor stated:

It is my knowledge and statement that every agreement between The New Hampshire Jockey Club, Inc. and the Horsemen's Benevolent and Protective Association and the Horse Owners with respect to purse distribution has always been based solely upon a percentage of The New Hampshire Jockey Club, Inc.'s share of the commissions it takes from each dollar wagered and has never been based upon the so-called breakage, since the breakage was specifically excluded from any consideration insofar as purse distribution is concerned. This form of agreement has long been established in New England and is well known and common knowledge to all Horse Owners. Pl. Ex. 10.

The testimony of Mr. White, Mr. Bartimo, and Mr. Graf, the affidavit of Gerald Colella, and the purse distribution sheets prove conclusively that the horse owners' bargaining agent (HBPA) and the defendants, the immediate parties to the agreements, intended and interpreted the purse agreements to mean that the 42% to 45.7% (depending on the track and year in question) was to be of the defendants' 7% or 7½% share of the mutuel handle and did not include breakage in any way.

■■ I find that the HBPA was the bargaining agent for the horse owners; plaintiffs' counsel conceded as much in final argument. Transcript, p. 974. The HBPA, therefore, had at least apparent authority, if not express or implied authority, to negotiate and enter into purse agreements on behalf of the horse owners. See Cote Brothers, Inc. v. Granite Lake Realty Corp., 105 N.H. 111, 193 A.2d 884 (1963), Atto v. Saunders, 77 N.H. 527, 93 A. 1037 (1915). The actions of the HBPA in negotiating and entering the purse agreements with the defendants may be considered ratified by the horse owners because they retained the purses—the fruits of the agreements. See Eastman v. Provident Mutual Relief Association, 65 N.H. 176, 18 A. 745 (1889).

The plaintiffs contend, however, that the understanding of the HBPA and the defendants is not binding on the horse

owners. To support this contention, they rely on two theories. The first is that the understanding of the New England horse owners should control in determining the meaning of the purse agreements, and the second is that the agreement must be interpreted in conformity with the state statutes defining track commission.

■ The plaintiffs' first theory has two requisite elements: (1) that the defendants and the HBPA concealed the actual meaning and implementation of the purse agreements from the horse owners; and, (2) that the New England horse owners commonly understood and believed that the defendants had agreed to pay a percentage of the breakage. The plaintiffs argue that since the defendants and the HBPA concealed the true meaning of the agreement, the understanding of the horse owners should control. This is an intriguing legal theory. The argument is that even if the agent (the HBPA) and the other contracting party (the tracks), the immediate parties to the agreement, agree on its meaning and terms, the principal may not only disavow the agent's understanding of the agreement, but also bind the other party to his (the principal's) understanding of the agreement because his agent has concealed its true meaning.

While there may possibly be jurisprudential merit to such a theory, it does not apply to the facts of this case. The fact that breakage was not being paid was not concealed from the horse owners either by the HBPA or the defendants, and the evidence does not even approach proving that the horse owners in New England commonly believed and understood that breakage was included in the purse agreement.

■■ The issue of concealment also determines the applicability of the statute of limitations. The complaints in the three cases were filed in March of 1968. Both New Hampshire and Rhode Island have six year statute of limitations in actions for breach of contract. R.I.Gen.Laws, Sec. 9–1–13 (1956), as amended; N.H.Rev.Stat.Ann., Ch. 508:4 (1968). Since the purse agreements were negotiated and effective on a year to year basis, the actions on the agreements of 1959 through 1962 are barred unless the plaintiffs establish fraudulent concealment by the defendant tracks. There is no doubt that fraudulent concealment tolls the statute of limitations in New Hampshire and Rhode Island. Lakeman v. LaFrance, 102 N.H. 300, 156 A.2d 123 (1959); R.I.Gen.Laws, Sec. 9–1–20 (1956), as amended.

■■ Although the plaintiffs allege concealment and collusion on the part of the HBPA and the defendants, the HBPA is not a party to this action.[7] The HBPA assumed the duty of informing the horse owners of the nature of the purse agreement, and there was no evidence that the defendants or the HBPA intentionally deceived or made any false representations to the horse owners. Under these facts, the defendants had no duty to disclose the terms of the agreement to the horse owners and their silence is not fraudulent concealment. In Kenyon v. United Electric Rys. Co., 51 R.I. 90, 151 A. 5 (1930), the Rhode Island Supreme Court stated:

> Where there is no fraud shown, neither the ignorance of a person of his right to bring an action nor the mere silence of a person liable to the action prevents the running of the statutes of limitations. Id. at 8.

See also Owen v. King, 130 Tex. 614, 111 S.W.2d 695 (1938).[8] Moreover, the fact

---

7. In Frank E. Berman, et al. v. Horsemen's Benevolent and Protective Ass'n., Equity No. 87025 (Super.Ct.Mass., Jan. 13, 1969), the plaintiffs' action was dismissed with prejudice.

8. The court is cognizant of those cases holding that there may be a duty to disclose if a fiduciary relationship exists. See Stetson v. French, 321 Mass. 195, 72 N.E.2d 410 (1947). The defendants here cannot be considered to be in a fiduciary relationship with the plaintiffs.

that the HBPA knew that breakage was not being paid may be imputed to the horse owners. Imputing the knowledge of the HBPA to the horse owners eliminates any question of fraudulent concealment by the defendants, bars the actions on the 1959, 1960, and 1961 contracts because of the six year statute of limitations, and disposes of the actions on the subsequent contracts because the horse owners would be bound by the interpretation of the HBPA officials.

■ The decision, however, need not rest on this narrow ground. There was no evidence that the HBPA or the tracks concealed the facts from the horse owners. The evidence discloses the contrary; many horse owners knew, and those who did not could easily determine, that breakage was not included under the purse agreements and not included in the term "track take."

The fact that "track take" did not include breakage was communicated to the horse owners in numerous ways. One method was by means of the Horsemen's Journal, a publication of the HBPA. The Journal is published monthly and mailed to each HBPA member. A number of selected pages introduced by the defendants indicated that the horse owners could easily determine that "track take" means the tracks' statutory percentage of the mutuel handle excluding breakage. In the March, 1956, Horsemen's Journal, for example, the following paragraph appears:

> Perhaps it should also be explained here that the policy of the HBPA is to negotiate for an equitable share of the mutuel take without considering any part of the considerable amount of revenue the tracks get from admissions, concessions, etc. *However, since several divisions do negotiate for a share of the breakage* * * * a column is always provided in these statistical charts showing what percentage the purse distribution is with the breakage included in the compilation. Deft. Ex. J. [Emphasis added.]

Defendants' Exhibit K shows the 1962 racing statistics as reported in the Horsemen's Journal. Comparable racing statistics were published each year in the Horsemen's Journal every April. This 1962 compilation and all other statistical charts published by the HBPA utilize two columns. One column is entitled "% Purses to Track Take" and the other entitled "% Purses to Track Take Including Breakage." Plaintiffs' counsel argues strenuously that this language is not determinative since the columns could have been entitled "% Purses to Track Take" and "% Purses to Track Take Excluding Breakage." The fact is, however, that the terms "Track Take" and "Track Take Including Breakage" were used. A reasonable man could only interpret this designation in the HBPA statistical charts to mean that "Track Take" does not include breakage.

These statistical charts also reveal that if the horse owners knew that the purses were to be 45.7% of track take, then they could deduce that this did not include breakage. For example, Defendants' Exhibit K shows that in the year 1962, the percentage of purses paid to track take at Rockingham Park was 45.-7%. It also shows that the percentage of purses paid to track take, including breakage, was 42.21%. In other words, although the percentage figure of purses to track take might not always be exactly 45.7% in the yearly statistical charts, the percentage of purses paid to track take, including breakage, was always less than the 44.7% to 45.7% levels and always less than the percentage of purses to "track take."

■ Although determining whether the formula at the three defendant tracks excluded breakage by examining the racing statistics might have involved some deductive logic, this information was readily available from other sources. The New England HBPA kept its own daily tally sheets to determine the amount of purses owed to the purse winners under the terms of the purse agreement. There was no evidence that these sheets were concealed from the horse owners. The HBPA has maintained an

office with regular office hours at each track during a racing meet. During the past five to six years, the HBPA has maintained two trailers at each track during a racing meet. These trailers are clearly marked and open to the horse owners on a daily basis. If any question arose as to whether breakage was included in the purse agreement, the horse owners could learn this from the HBPA officials. In addition to the regular office hours, bulletins were posted at the tracks and bulletins mailed to New England horse owners on a regular basis. Mr. Bartimo, the publicity director of the New England HBPA from 1954 through 1962, testified that bulletins, or circular letters, were sent to New England horse owners approximately four times per year. Mr. Bartimo testified that these bulletins contained specific information regarding the purse agreements at the defendant tracks.

From all the evidence, it is clear that the information regarding the purse agreements was either made known to the horse owners or readily available to them. Any horse owner who was unsure of the specifics of the purse agreement could have learned that breakage was not included through an examination of HBPA literature or at the HBPA offices at the track. I find, therefore, that there was no fraudulent concealment or misrepresentation by the HBPA or by the defendants.

The fact that the horse owners knew or should have known that breakage was not paid becomes even more evident upon considering the understanding of individual horse owners as to the specifics of the purse agreements. The plaintiffs contend that the horse owners racing at the defendant tracks commonly understood that breakage was included in the purse agreement, *i. e.*, that "track take" includes breakage. The contrary is established by the evidence. One of the named plaintiffs, Frank E. Berman,

testified on cross-examination that he had no knowledge of any kind of the specifics of the purse agreements until 1967.[9] Without any knowledge of the specifics of the purse agreements, it is difficult to discern how he or others could reasonably believe that breakage was included in the 45.7% formula since there was no evidence that the HBPA or the defendants ever represented that breakage was included.

■ The plaintiffs have placed great reliance on the doctrine of custom and usage. The plaintiffs urge that custom and usage dictates that the contract be construed to mean that the horse owners are entitled to breakage. The legal definition of the phrase custom and usage is helpful. 21 Am.Jur.2d Customs and Usages § 1 (1965) defines the phrase as follows:

A "custom" is a practice which has by its universality and antiquity acquired the force and effect of law, in a particular place or country, in respect to the subject matter to which it relates. * * * The term "usage," on the other hand, in its narrowest sense, denotes merely a uniform course of conduct in some particular business or calling, even though it is that of only one person. * * *

Usage consists of a repetition of acts, and custom arises out of this repetition, so that while there may be usage without custom, there can be no custom without usage to accompany or proceed it.

Contrary to plaintiffs' contention, if there was a "custom and usage" as to "track take" in New England, it was that breakage was not paid. None of the tracks in New England ever paid breakage under the percentage of track take formula. There is, therefore, no usage, and certainly no custom in New England, of paying a share of the breakage to the purse winners. On the na-

---

9. See Transcript, pages 529–531. On page 530, the following colloquy appears:

 Q. For all practical purposes, and for the purposes of this case, you, as a

plaintiff here, had no knowledge of any kind of contract that we are talking about here until 1967.

 A. I'd have to say that's correct, sir.

tional level, the evidence discloses that only two, or possible three states (California, Illinois, and New York), pay breakage under a purse agreement with the horse owners. There is no usage and no custom on the national level to induce horse owners to believe that a percentage share of the breakage was being paid under the purse agreements with the defendants.

 To prove that the common understanding of the horse owners in New England was that they were entitled to a percentage of the breakage, the plaintiffs attempted to introduce fifty-nine form letters signed by New England horse owners indicating that they thought breakage was included. Although not expressly introduced as such, these letters could only be received as a poll of the New England horse owners. The question of admissability of polls was thoroughly discussed in the Report of the Judicial Conference Study Group on Procedure in Protracted Litigation, 25 F.R.D. 351 (1960). The two tests for the admissibility of a poll are its necessity and its trustworthiness. The general guidelines relating to opinion or belief polls were stated as follows:

> If * * * a poll records subjective data such as the beliefs, opinions or motivations of the interviewees, its trustworthiness may well be less; the showing of necessity in such case should be stronger, and the question of trustworthiness should be more

In the absence of any recognized custom and usage, the poll is a necessity here to prove plaintiffs' contention that the horse owners in New England believed that breakage was included in the purse agreement.

The offeror of a poll has the burden of showing its trustworthiness. The Judicial Conference Study Group stated that the offeror should show that:

> the persons conducting the survey were recognized experts; the data gathered was accurately reported; the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of

objective procedure and statistics in the field of such surveys; *the sample design and the interviews were conducted independently of the attorneys*; and the interviewers, trained in this field, had no knowledge of the litigation or the purposes for which the survey was to be used. Id. at 429. [Emphasis added.]

The plaintiffs' survey falls far short of these criteria. The form letters were written by Mr. Berman or his counsel and mailed to some five hundred and eighty-nine horse owners and trainers in October of 1970. Eighty-one of these were returned by the Post Office as non-deliverable. In terms of the estimated size of the class, 3,500 to 5,000, the fifty-nine returned letters represent only about 1% of the class. The form letter gives the details of the lawsuit and phrases the issue so as to most benefit the named plaintiffs' point of view. Pl. Ex. 17, 19–22 For Identification. Such a poll is not objective, scientific, or impartial.

Moreover, the testimony of the plaintiffs' own witnesses, some of whom signed the form letters, indicates only that there was no common understanding of the horse owners that breakage was included in the purse agreements. The testimony of those horse owners with knowledge of the agreement indicates that they knew breakage was not included. Thomas Bartelho testified on direct examination:

> To break it right down, when I got into it, I would be informed that the track was paying 44.7 of the 7 per cent of the share of the mutuel end. Transcript, p. 707.

Mr. Bartelho testified that he learned this from HBPA officials in 1965 or perhaps earlier.

Ambrose Campbell, who signed one of the form letters, testified that he was under the impression that the horse owners were entitled to 45.7% of the total handle, i.e., "45.7 of the total amount wagered that day, which would include the breakage." Transcript, p.

754. This indicates that Mr. Campbell was not familiar with the mechanics of figuring the distribution of funds between the state, the track, and the bettors.

Samuel Applestein, who also signed the form letter, testified that breakage "never entered my mind." Transcript, p. 763. Upon reviewing the form letter and being asked if it represented his understanding, Mr. Applestein stated:

No. I assumed that the breakage was split down the middle, half to the track and half to the state. Whatever went on further would have to go through the purse committee of the H.B.P.A., which I was a member of, which was their job. Transcript, pp. 764–65.

Mr. Applestein also stated that he was familiar with "breakage and purse distribution because it's [sic] a topic all over the nation for the past four or five years." Transcript, p. 766.

James Kelly, who signed a similar form letter, testified that he knew nothing about the formula and assumed it was the same from 1950 to 1970. He testified that he agreed with Mr. Berman "to get it or to try and get it if it was due us." Transcript, p. 774.

The final witness for the plaintiffs in this area was Gustave Moray. His testimony indicates that he knew that breakage was not paid to the purse winners. He testified that he learned about breakage "four or five years ago" from Max White.

And he said it went to the state and the track. And at that time I thought it would be a splendid idea to see if we couldn't talk to both the state and the track and see if they wouldn't put it in a pension fund for horsemen. Transcript, p. 788.

The reason for any lack of understanding on the part of some horse owners on the question of breakage may be attributed primarily to the informality of the procedures in horse racing. The condition books list purses, and the primary concern of the horse owners is the amount of the purse. The detailed mechanics involved in arriving at this purse is of minor importance to the horse owners. As stated by Mr. Moray:

I more or less considered the race track, well, like an apartment house. You want to hire an apartment, you go there and hire it. I wanted to race there, I went and raced there. There was a purse, I ran for it. And the mechanics of it I didn't know. Transcript, p. 789.

▬ The plaintiffs' final theory is that the term "track take," regardless of the meaning ascribed to that term by the defendants or the HBPA negotiators, must be interpreted to mean the tracks' percentage share of the handle plus one-half of the breakage because of the language of the state statutes. The state statutes governing the tracks' share of the handle, R.I.Gen.Laws, Sec. 41–4–4 and N.H.Rev..Stat.Ann., Ch. 284:22, *supra*, p. 1159, do not use the phrase "track take." The statutes use the word "commission." The plaintiffs contend that "track take" must be equated with "commission" because a contract term cannot be interpreted in derogation of a statute defining that term. If the agreements involved used the word commission, this theory might have merit. The plaintiffs, however, seek to equate "track take" with commission on the grounds that the statutes define what part of the handle the defendants may keep as their share.

▬ This theory overlooks two important factors. First, the statutes involved deal solely with the distribution of the "total take out" between the state and the tracks. The statutes do not prescribe the division of funds between the tracks and the horse owners in any way. The statutes contain no reference to the manner of determining purses or the amount that should be paid to purse winners as purses. Secondly, relying on state statutes which do not utilize the term "track take" and do not refer at all to purse distribution would be to completely overlook an elementary concept of contract law. The understanding and

meaning ascribed to an agreement by the immediate parties to its making should be controlling. See Bogosian v. Fine, 99 N.H. 340, 111 A.2d 190 (1955). The evidence established that both the officials of the New England Division of the HBPA who negotiated the agreements and the defendants did not intend or interpret the agreements to include a percentage of the breakage. Equating "track take" to the commission defined by the statutes would not only require reading non-existent provisions into the statutes, but also completely subvert the intent and understanding of the immediate parties to the agreement. Relying on the statutes and ignoring the facts and the intent of the parties would result in the imposition of a court-made contract.

### SUMMARY OF FINDINGS AND RULINGS

I find and rule that:

(1) The New England Division of the HBPA was the authorized bargaining agent for the horse owners and had authority to negotiate and enter into purse agreements with the defendants;

(2) The purse agreements between the defendants and the horse owners called for a percentage of "track take" to be paid to the purse winners;

(3) "Track take" as interpreted by the defendants and the New England HBPA officials who negotiated the purse agreements means the defendants' statutory percentage of mutuel handle excluding breakage;

(4) The term "track take" means the defendants' statutory percentage of the mutuel handle excluding breakage;

(5) The New England horse owners could not reasonably believe that they were entitled to a percentage of the defendants' statutory percentage of the mutuel handle plus a percentage of the breakage;

(6) There was no common understanding of New England horse owners that breakage was included in the purse agreements;

(7) Neither the defendants nor the HBPA concealed the fact that breakage was not being paid;

(8) Any interested horse owner could have ascertained that breakage was not included under the purse agreements with the defendants by appropriate inquiry;

(9) The applicable state statutes defining track commission do not control the meaning of the term "track take" used in the purse agreements; and

(10) The defendants have not breached the purse agreements.

Judgment for the defendants.

So ordered.