Draxel P. STRICKLAND, Jack Grainger, Charles Freeman and James H. Roberts, Plaintiffs,

v.

FLUE–CURED TOBACCO COOPERATIVE STABILIZATION CORPORATION, the American Tobacco Company, the Austin Company, Inc., Austin-Carolina Co., Inc., Brown & Williamson Tobacco Corporation, Carolina Leaf Tobacco Company, Inc., Carolina Leaf International Corporation, Dibrell Brothers, Incorporated, Export Leaf Tobacco Company, Gallaher, Ltd., Imperial Tobacco Group, Limited, Liggett Group, Inc., Lorillard, Inc., A.C. Monk & Company, Inc., Phillip Morris, Incorporated, Mullins Leaf Tobacco Company, Inc., R.J. Reynolds Tobacco Co. (R.J. Reynolds, Inc.), J.P. Taylor Company, Incorporated, Universal Leaf Tobacco Company, Incorporated, C.W. Walters Company, Incorporated, T.S. Ragsdale Company, Inc., Richard E. Lyng, Secretary of Agriculture of the United States, Commodity Credit Corporation, ABC Corporation, John Doe and Richard Roe, Defendants.

Civ. A. No. 86–311–3.

United States District Court, D. South Carolina.

Aug. 26, 1986.
Judgment Aug. 27, 1986.

E.N. Zeigler, P.O. Drawer 150, Florence, S.C., for plaintiffs.

James K. Dorsett, Jr., Nigel (Tex) B. Barrow, Jr., Raleigh, N.C., D. Laurence McIntosh, Florence, S.C., for Flue-Cured Tobacco Cooperative Stabilization Corp.

Daniel O. Neil, Paul Pennoyer, Chadbourne & Parker, New York City, H. Simmons Tate, Jr., Boyd, Knowlton, Tate & Finlay, Columbia, S.C., for American Brands, Inc. The American Tobacco Co., Gallaher, Ltd.

Ray V. Hartwell, III, Robert Brooks, Virginia Powell, Hunton & Williams, Richmond, Va., Mark W. Buyck, Jr., Wilcox Law Firm, Florence, S.C., for The Austin Co., Inc., Austin-Carolina Co., Inc., Carolina Leaf Tobacco Com'n Inc., Carolina Leaf Intern. Corp., Dribrell Brothers, Inc., A.C. Monk & Co., Inc., and C.W. Walters Co., Inc.

Norwood Robinson, Michael L. Robinson, Petree, Stockton & Robinson, Winston-Salem, N.C., Hubert E. Yarborough, III, C. Diane Smock, Yarborough, Moore & Smock, Greenville, S.C., for Brown & Williamson Tobacco Corp. and Export Leaf Tobacco Co.

Z. Hardy Rose, Rose, Jones, Rand & Orcutt, P.A., Wilson, N.C., Mark W. Buyck, Jr., Wilcox Law Firm, Florence, S.C., for Imperial Tobacco Group, Ltd.

Joe Rogers, Marion S. Riggs, Rogers & Riggs, Manning, S.C., for Liggett Group, Inc.

Joseph W. Gleb, Jay Fastow, Weil, Gotshal & Manges, New York City, Barney O. Smith, Jr., Rita McKinney, Greenville, S.C., for Lorillard, Inc.

Bruce L. Montgomery, Timothy J. Lindon, Arnold & Porter, Washington, D.C., Henry Smythe, Buist, Moore, Smythe & McGee, Charleston, S.C., for Phillip Morris, Inc.

W.G. Champion Mitchell, Mark N. Poovey, Martin L. Holton, III, Gary W. Jackson, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., David L. Freeman, Henry L. Parr, Jr., Wyche, Burgess, Freeman & Parham, Greenville, S.C., Saunders M. Bridges, Sr., Bridges & Orr, Florence, S.C., for R.J. Reynolds Tobacco Co. (R.J. Reynolds, Inc.)

Mark W. Buyck, Jr., Wilcox Law Firm, Florence, S.C., for T.S. Ragsdale Co., Inc.

Samuel W. Hixon, III, Walter J. McGray, Margaret I. Bascigal, Williams, Mullen &

Christian, Richmond, Va., William M. Grant, Jr., Bryan F. Hickey, Haynsworth Law Firm, Greenville, S.C., for J.P. Taylor Co., Inc. and Universal Leaf Tobacco Co., Inc.

David H. White, Dept. of Justice, Washington, D.C., John B. Grimball, Asst. U.S. Atty., Columbia, S.C., Paul Wilburn, Asst. U.S. Atty., Greenville, S.C., for Richard E. Lyng, Sec. of Agriculture of the U.S. Commodity Credit Corp.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

Given the public interest in this action and in the interest of time, the Court issued an Order dated July 31, 1986, dismissing this case pursuant to Rules 12(b)(1) and 12(b)(6) of the *Federal Rules of Civil Procedure.* The Court hereby issues this detailed Order providing the reasons for its decision.

## FINDINGS OF FACT

The plaintiffs are growers of flue-cured tobacco. They brought this lawsuit as representatives of a class consisting of all producers of flue-cured tobacco in the United States who sold tobacco to the corporate defendants and who are members or stockholders of the defendant Flue-Cured Tobacco Cooperative Stabilization Corporation. The Defendants are Richard E. Lyng, Secretary of Agriculture (the "Secretary"); the Commodity Credit Corporation ("CCC"), a federally chartered corporation through which the price support program is administered by the Secretary; the Flue-Cured Tobacco Cooperative Stabilization Corporation ("Stabilization"), a cooperative incorporated under the laws of the State of North Carolina whose members are flue-cured tobacco growers and which executes the tobacco price support program under contract with CCC; and several tobacco purchasing companies, including the nation's largest cigarette manufacturers and numerous tobacco dealers.

The plaintiffs challenge the payment of rebates to purchasers of the 1985 crop of flue-cured tobacco pursuant to the Federal Tobacco Price Support Program (the "Tobacco Program"). The Tobacco Program was created to provide producers with higher prices for their product than they would normally receive. 7 *U.S.C.* § 1311, *et seq.*

In 1982, Congress enacted legislation requiring the Tobacco Program to be self-supporting by charging annual assessments to growers on each pound of tobacco marketed.[1] The No Net Cost Tobacco Program Act (the "No Net Cost Act") was intended to enable the Tobacco Program to operate at no net cost to taxpayers. *See* 7 *U.S.C.* § 1445–1 (1982) (Note, "Congressional Findings and Declaration of Purpose"). The amount of assessments are calculated in accordance with this purpose. Payments of the assessments are held either by Stabilization in a separate no net cost tobacco fund ("Fund") or by CCC in a no net cost tobacco account ("Account"). Under the original legislation, moneys held in an Account by CCC or in a Fund by Stabilization could only be used to ensure that CCC suffered no net losses under its loan agreements with Stabilization. In 1983, the statute was amended to permit other uses of the Fund, including any use approved by the Secretary which would be mutually beneficial to CCC and the tobacco producers.[2]

---

**1.** Pub.L. No. 97–218, Title 1, § 101, 96 Stat. 197 (*amended* November 9, 1983), Pub.L. No. 98–180, Title 2, § 203, 97 Stat. 1145 (*codified at* 7 *U.S.C.* §§ 1445–1 and 1445–2).

**2.** 7 *U.S.C.* § 1445–1(d)(3) now provides in part as follows:

 The Secretary shall ...

 (3) require that the Fund established by each association shall be kept and maintained separate from all other accounts of the association and shall be used exclusively, as prescribed by the Secretary, for the purpose of ensuring, insofar as practicable, that the Corporation, under its loan agreements with the association with respect to 1982 and subsequent crops of quota tobacco, will suffer no net losses (including, but not limited to, recovery of the amount of loans extended to cover the overhead costs of the association), after any

Under legislation enacted in 1983, the price support level for 1985 was frozen at the 1982 level, $1.70 per pound, subject to the discretion of the Secretary to reduce the support price by approximately five cents per pound under certain conditions.[3] Stabilization declared that the 1985 assessment required by the No Net Cost Act would be 25 cents per pound. The assessment for 1984 had been only 7 cents per pound.[4]

In 1985, the Secretary, pursuant to 7 U.S.C. § 1445–1(d)(3), authorized Stabilization to use some moneys from the Fund to pay rebates to purchasers of tobacco during the 1985 marketing season.[5] Under the rebate plan, ten cents was to be rebated for each pound of tobacco purchased. An additional fifteen cents per pound was to be rebated if two conditions were met: (1) purchasers had to buy a total of 650,000,-000 pounds of 1985 crop tobacco during the

net gains are applied to net losses of the corporation under paragraph (5): Provided, that, notwithstanding any other provision of law, use by the association of moneys in the Fund, including interest and other earnings, for the purposes of reducing the association's outstanding indebtedness to the Corporation associated with 1982 and subsequent crops of quota tobacco and making loan advances to producers is authorized, and use of such moneys for any other purposes that will be mutually beneficial to producers who contribute to the Fund and to the Corporation, shall, if approved by the Secretary, be considered an appropriate use of the fund.

**3.** In accordance with the existing legislative formula, *see* 7 U.S.C. § 1445, the 1982 support level was determined by adjusting the 1959 support level to reflect the increased costs of production. Although it did not purport to repeal the existing formula, the Tobacco Adjustment Act of 1983, Pub.L. 98–180, Title II, § 202, 97 Stat. 1144, directed that the support level for the 1984 and 1985 crops be frozen at the 1982 level. *See* 7 U.S.C. § 1445(f). In addition, the Secretary was given the authority to further adjust the 1985 support level if certain conditions were met. This latter provision is commonly referred to as the "Nunn Amendment," and, if invoked, it has the effect of lowering the support level by approximately five cents. *See* 7 U.S.C. § 1445(g).

**4.** The price support level of $1.70 per pound substantially exceeded the world market price, putting American flue-cured tobacco at a competitive disadvantage and depressing sales. As a consequence, larger amounts of tobacco went unsold and thus went under loan to Stabilization. The increasing amount of loans and the increasingly large inventory of tobacco maintained by Stabilization steadily increased the cost of the price support program and, accordingly, mandated the increase in the assessment. To deal with these problems, a bill to restructure the price support program was introduced in Congress on July 10, 1985, to reduce the price support level, to reduce the inventory held by Stabilization, and consequently, to reduce the assessments required of producers. The legisla-

tion was passed into law on April 7, 1986. Pub.L. 99–972, Title I, §§ 1101, *et seq.*, 100 Stat. 82. The Act was accompanied by the findings of Congress that "the present tobacco price support program is in jeopardy and in need of reform." § 1101(a)(2).

**5.** The rebate program was announced in a press release issued by the Department of Agriculture on July 23, 1985. The press release stated in full:

Washington, July 23—Secretary of Agriculture John R. Block today approved a request of the Flue-Cured Tobacco Cooperative Stabilization Corporation to effectively reduce the 1985–crop flue-cured tobacco loan rate by 5 cents per pound and authorized rebates as incentives to purchasers of this kind of tobacco.

Secretary Block said he lowered the loan rate to $1.65 per pound as permitted by the Nunn Amendment to make the tobacco more price competitive.

Block said he authorized the Stabilization Corporation to offer buyers of this year's crop a 10 cents per pound rebate from the no-net-cost tobacco fund at the beginning of the marketing season. The 10–cent rebate will further reduce the effective 1985 loan rate to $1.55 per pound.

Another rebate of 15 cents per pound has been authorized to be paid at the end of the marketing season on all purchases if during the season buyers have purchased at least 650 million pounds of the 1985 flue-cured crop and, subject to prices and conditions to be made available to buyers by the Stabilization Corporation, at least 125 million pounds of the 1976–1985 flue-cured inventory.

Secretary Block said he intends to keep the tobacco program operating at no-net-cost to taxpayers but wishes to be flexible in carrying out this principle and will work with the tobacco industry to keep the no-net-cost fund sound.

He said also that while he is willing to offer these concessions announced today, he at the same time expects everyone in the tobacco industry to do their part to ensure a successful 1985 flue-cured sale.

1985 marketing season; and (2) purchasers had to buy at least 125,000,000 pounds from Stabilization's inventory of 1976–1984 crop tobacco by the end of 1985. The purpose of the rebate program was (1) to reduce the amount of 1985 crop tobacco going into Stabilization's inventory by lowering the effective price support level,[6] and (2) to reduce the 1976–1984 crop tobacco already in the inventory. Full rebates were paid to tobacco purchasers and the plaintiffs thereafter commenced this action.

The defendants have moved to dismiss this action pursuant to Rule 12(b)(1) of the *Federal Rules of Civil Procedure* on the ground that the Court lacks subject matter jurisdiction. Alternatively, the defendants have moved to dismiss pursuant to Rule 12(b)(6) on the ground that the plaintiffs have failed to state a claim upon which relief can be granted.

## CONCLUSIONS OF LAW

In their motion to dismiss, the defendants claim that the plaintiffs lack standing to pursue this action. Article III of the United States Constitution confines federal courts to adjudicating actual "cases" and "controversies." Among the doctrines that have arisen from Article III is the doctrine that requires a litigant to have "standing" to invoke the power of a federal court. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975)).

■ To have standing, a plaintiff must allege the following: (1) an actual injury within the zone of interests protected by statute; (2) the injury must be fairly traceable to the specific agency action challenged; and (3) the injury must be such that it likely would be redressed by a favorable decision. *Motor Coach Industries,*

*Inc. v. Dole,* 725 F.2d 958, 963 (4th Cir. 1984) (*citing Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). Specifically, the plaintiffs' complaint must contain allegations demonstrating that the action they challenge caused them injury-in-fact, economic or otherwise. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The injury must be "distinct and palpable and not abstract or conjectural or hypothetical." *Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3325 (citations omitted). A plaintiff must allege "specific, concrete facts demonstrating that the challenged practices harm[ed] him, and that he personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin,* 422 U.S. at 508, 95 S.Ct. at 2210.

■ In the action before this Court, the Secretary's authorization for Stabilization to give rebates was not an actual injury personal to the plaintiffs. The plaintiffs' cannot contend that their injury was the requirement to pay an assessment on the sale of their tobacco. Producers were required to pay the assessment notwithstanding the adoption of the rebate program. The plaintiffs' only complaint appears to be the use of the Fund. However, the plaintiffs had no real interest in the Fund because it was governed by Stabilization, designed to protect CCC from losses and dedicated to be used for the mutual benefit of Stabilization and CCC. 7 *U.S.C.* § 1445-1(d)(3). Consequently, at most, the rebates may have constituted an injury to Stabilization, not to the plaintiffs individually.

The plaintiffs also lack standing because the injury alleged would not be redressed by the requested relief. The plaintiffs seek a refund to Stabilization. Even if the injury were personal to the plaintiffs, the requested relief would benefit Stabilization, not the plaintiffs themselves. Therefore, since the injury claimed is not personal to

---

**6.** The 25 cents per pound rebate effectively reduced the price support level to $1.40 per pound as contemplated when the legislation was introduced. This was done in two steps: a reduction to $1.55 on opening day and a further reduction on sale of the inventory.

the plaintiffs, or, even if it were, the injury would not be redressed by the requested relief, the plaintiffs lack standing.

■ Since both the injury, if any, and the requested relief directly effect Stabilization, the plaintiffs, as shareholders or members of the corporation, may have had standing had they brought a derivative suit. It is well-settled that a shareholder of a corporation lacks standing to proceed individually for an injury suffered by the corporation; instead, a shareholder must assert the rights of a corporation through a derivative action. *Stevens v. Lowder,* 643 F.2d 1078 (5th Cir.1981); *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Baker v. Data Dynamics, Inc.,* 561 F.Supp. 1161 (W.D.N. C.1983). The plaintiffs, who are members or stockholders of Stabilization, seek an accounting of the tobacco purchasers and restitution to Stabilization. These claims clearly are made derivatively on behalf of Stabilization.

Rule 23.1 of the *Federal Rules of Civil Procedure* sets out the requirements for derivative actions. That rule provides as follows:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and

the reasons for his failure to obtain the action or for not making the effort. This rule is "not a technical procedural requirement," *Smachlo v. Birkelo,* 576 F.Supp. 1439, 1443 (D.Del.1983), but reflects important policy concerns. Verification, for example, "serves the important purpose of ensuring 'that the plaintiff or some other person has investigated the charges and found them to have substance.'" *Id.,* at 1442 (*quoting Porte v. Home Federal Savings & Loan Association,* 409 F.Supp. 752, 754 (N.D.Ill.1976)). The requirement of a demand on directors and shareholders is designed, among other things, "to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged." *Heit v. Baird,* 567 F.2d 1157, 1162 n. 6 (1st Cir.1977).

■ The plaintiffs have failed to comply with Rule 23.1 in at least four respects:

1. They have alleged neither any effort made to obtain the desired action from the directors, nor their reasons for failing to obtain the action or for not making the effort;

2. They have failed to allege that the action is not collusive;

3. They have not verified the complaint; and

4. They have not clearly alleged that they were shareholders or members at the time of the transaction in issue or the devolution of such status by operation of law.

The requirements of Rule 23.1 are to be "vigorously enforced" and failure to meet them "requires dismissal of the suit." *Heit v. Baird,* 567 F.2d at 1160; *see Baker v. Data Dynamics, Inc.,* 561 F.Supp. at 1164–65. Since the plaintiffs seek relief on behalf of Stabilization, a corporation, but have not complied with the requirements for a derivative action, they lack standing to bring the action before this Court.

Since the plaintiffs lack standing, the Court dismisses the suit pursuant to Rule 12(b)(1) of the *Federal Rules of Civil Procedure* for lack of subject matter jurisdic-

tion. Alternatively, the Court dismisses the action pursuant to Rule 12(b)(6) because the plaintiffs have failed to state a claim upon which relief can be granted, as discussed below.

The plaintiffs allege that the No Net Cost Act is an unconstitutional delegation of power to the Secretary. Specifically, the plaintiffs claim that the statute (1) fails to set any standard to guide the Secretary's actions, and (2) permits the Secretary to dispose of private property for a public purpose without adequate compensation in derogation of the Fifth Amendment.

The plaintiffs' first claim of unconstitutionality is based on the proposition that Congress cannot delegate its essential legislative functions. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). They contend that Congress did not clearly delineate the boundaries of the authority delegated in 7 *U.S.C.* § 1445–1(d)(3) and that this failure renders the statute unconstitutional.

█ A delegation of power is constitutionally sufficient "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries to this delegated authority." *American Power & Light Co. v. Securities & Exchange Commission*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). The plaintiffs do not attack the clarity with which Congress delineated either the general policy of the statute delegating power or the public agency which is to apply it; those matters are clearly addressed by the legislative history[7] and the statute.[8] The plaintiffs claim, instead, that the power delegated to the Secretary pursuant to 7 *U.S.C.* § 1445–1(d)(3) to use moneys in the Fund "for any other purposes that will be

mutually beneficial to producers who contribute to the fund and to [CCC]" is unconstitutionally vague.

The plaintiffs' contention, however, is without merit. The legislative history of Section 1445–1(d)(3) clearly reveals congressional intent in enacting the contested provision:

> The Committee bill seeks to provide reasonable flexibility to an association to use the moneys for purposes that would be beneficial to both CCC and the associations. For example, reducing the association's outstanding indebtedness to CCC for the 1982 and subsequent crops of tobacco and making loan advances to producers, would result in fewer association loans for CCC, thus reducing the costs to both CCC and the association, and ultimately to the producers of tobacco who must pay for the cost of the program.

S.Rep. No. 98–163, 1983 U.S.Cong. and Adm.News, p. 1658, at 1690. Congress clearly intended to provide the Tobacco Program with enough flexibility to adopt programs which would decrease costs both to CCC and the tobacco association, thereby mutually benefitting those parties and, ultimately, the tobacco producers. The rebate program, which was intended to increase tobacco sales and thereby benefit CCC, Stabilization, and the tobacco producers, is such a program.

Although the statute does not specify that the Secretary may authorize a rebate program, Congress is not compelled to do so. To require Congress to prescribe detailed rules for all the possible purposes for which the Fund moneys could be used would be to "demand the impossible or the impracticable." *Yakus v. United States*, 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944); *see also American Pow-*

---

7. The fund is to be used exclusively to achieve the objective of the bill—the operation of the Tobacco Price Support Program at no net cost to the taxpayer, other than administrative costs common to the operation of support programs for all commodities. H.Rep. No. 97–613, 1982 U.S.Code Cong. and Adm.News, p. 484, at 485.

8. The public agency which is to apply the authority is clearly identified as CCC through which the Secretary may act. 7 *U.S.C.* §§ 1445–1(a)(2), 1445–1(b).

*er & Light v. Securities & Exchange Commission,* 329 U.S. at 105, 67 S.Ct. at 142. In both *Yakus* and *American Power & Light,* the Supreme Court upheld statutes containing vague standards and statements of policy and delegating very broad discretion.

The boundaries of the authority delegated in 7 *U.S.C.* § 1445–1(d)(3) are sufficiently clear. Consequently, the statute does not contain an unconstitutional delegation of power.

■ The plaintiffs' second claim of unconstitutionality, that the No Net Cost Act permits a taking of property without just compensation, also is without merit. It is well-established that the exercise of the commerce power does not constitute a taking. *See, e.g., American Power & Light Co. v. Securities & Exchange Commission,* 329 U.S. at 106–07, 67 S.Ct. at 142–43; *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Southern Louisiana Area Rate Cases v. Federal Power Commission,* 428 F.2d 407, *cert. denied sub nom. Municipal Distributor Group v. Federal Power Commission,* 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 47 (1970); *United States v. Certain Parcels of Land Situated in the City of Valdez,* 666 F.2d 1236 (9th Cir.1982). In addition, the imposition of assessments has long been held to be a legitimate means of regulating commerce. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 882, 87 L.Ed. 122 (1942); *State of S.C. Ex Rel. Tindal v. Block,* 717 F.2d 874 (4th Cir. 1983).

The Tobacco Program in general and the No Net Cost Act in particular clearly effect interstate commerce. The assessment charged to the tobacco producers pursuant to the price support program is a fee that Congress may impose pursuant to the commerce clause of the Constitution. U.S. Const. Art. 1, § 8, Cl. 3. Consequently, the assessments do not constitute a taking of property requiring just compensation.

■ Similarly, the use of the moneys raised through the assessments to pay the rebates to the tobacco purchasers is not an unconstitutional taking. The moneys in the Fund did not belong to the plaintiffs. The disposition of the Fund moneys could only be made through Stabilization in the manner and for the purpose provided in the statute. Since Stabilization could properly use the moneys for rebates, no unlawful taking occurred.

■ The plaintiffs also allege that the Secretary's approval of the rebate program was arbitrary, capricious, and an abuse of discretion. This allegation has no merit. Among the responsibilities imposed on the Secretary by 7 *U.S.C.* § 1445–1(d)(3) is the duty to approve or disapprove proposals by Stabilization to use the Fund for such "other purposes that will be mutually beneficial to producers who contribute to the Fund and to [CCC]." The Secretary approved the rebate plan in order to benefit Stabilization and CCC by increasing tobacco sales and reducing the amount of price support loans and warehouse loans and other expenses attendant to maintaining tobacco in inventory.[9] Since the Secretary's intent in

---

**9.** The legislative findings incorporated in the 1985 "Tobacco Program Improvements" clearly identify some of Congress' concerns about the tobacco program. Congress found as follows:

(2) the present tobacco price support program is in jeopardy and in need of reform;

(3) under present law, the levels of price support for tobacco have resulted in market prices for tobacco that are not competitive on the world market;

(4) as a consequence, extremely large quantities of domestic tobacco have been put under loan and placed in the inventories of the producer-owned cooperative marketing associations that administer the tobacco price support program;

(5) the increased inventories have led to a significant increase in the assessments producers are required to pay to maintain the tobacco price support program on a "no net cost" basis;

(6) such increasingly large assessments are creating a severe hardship on producers;

(7) the existence of such large inventories poses a threat to the orderly marketing of future crops of tobacco;

(8) inventories of producer associations must be significantly reduced or the tobacco price support program will collapse;

(9) the Commodity Credit Corporation is threatened with substantial losses on disposi-

approving the rebate program was consistent with both the purpose of the No Net Cost Act that the tobacco price support program operate at no net cost to the taxpayers and the legislative mandate that the Fund be used for the mutual benefit of CCC and Stabilization, the Secretary clearly acted within his discretion and not arbitrarily or capriciously. Consequently, the plaintiffs have no claim against any of the defendants.

 Having reaped the benefits of the rebate plan, the plaintiffs now challenge the statute which authorized the rebates. The doctrine of constitutional estoppel, however, bars them from sustaining such an attack. The Supreme Court has refused to allow litigants to challenge statutes under which they have voluntarily received benefits. *United States v. City & County of San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). In *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), the Supreme Court held that "[i]t is an elementary rule of constitutional law that one may not 'retain the benefits of the Act while attacking the constitutionality of one of its important conditions.' And that '[t]he Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits.' " *Id.* at 255, 67 S.Ct. at 1556 (citations omitted). *See also Federal Deposit Insurance Corporation v. American Bank Trust Shares, Inc.,* 460 F.Supp. 549, 556–57 (D.S.C.1978) (finding that the *Fahey* "decision has not been overruled or modified in any particular" and the plaintiffs are estopped from contesting and have "waived their right to contest the constitutionality of the statutes."), *aff'd on other grounds,* 629 F.2d 951 (4th Cir.1980).

The tobacco producers, including the plaintiffs, voluntarily adopted the produc-

tion control and price support system established by Congress and received price support pursuant to that program. The availability of price support was expressly conditioned by statute upon the payment of assessments to ensure that the program operated at no net cost to the taxpayers. The uses of Fund moneys are described in the No Net Cost Act. In addition, the plaintiffs knew from a press release that the moneys would be used to pay rebates. *See* Footnote 5, *supra.* The plaintiffs have received and are seeking to retain benefits under the No Net Cost Act and specifically under the rebate program, including the increased sale of their tobacco and the decreased costs of the Tobacco Program. Consequently, they have waived their right to challenge and are estopped from attacking the application of the provision in the No Net Cost Act upon which the receipt of those benefits was based.

Just as the plaintiffs may not challenge a statute from which they have reaped benefits, they may not rescind the contracts with the tobacco purchasers in part and affirm them in part. *See King v. Continental Casualty Co.,* 110 F.2d 950 (4th Cir.1940); *Parker v. White,* 235 N.C. 680, 71 S.E.2d 122 (1952); *see also Joyce v. Davis,* 539 F.2d 1262 (10th Cir.1976). Although they seek restitution to Stabilization of rebate moneys received, the plaintiffs do not offer to rescind the purchase contracts by returning the purchase price in exchange for the tobacco. However, they must either repudiate and rescind the tobacco purchase contracts in whole or ratify them in their entirety.

 This principle applies even though Stabilization acted as the plaintiffs' agent in the questioned transactions.[10] A contract made by an agent in excess of its authority must be ratified or repudiated in

---

tion of these inventories should the tobacco price support program collapse....
"Consolidated Omnibus Budget Reconciliation Act of 1985," Title I, § 1101.

**10.** The special relationship between a farm marketing cooperative—such as Stabilization—and its producer-members was noted in *Hiatt Grain*

*& Feed, Inc. v. Bergland,* 446 F.Supp. 457 (D.Kan.1978), *aff'd,* 602 F.2d 929 (10th Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980):

*'The members are the association,* and the officers and directors of the association are, from a practical point of view, simply their

whole by the principal. *Teague v. Maddox,* 150 U.S. 128, 14 S.Ct. 46, 37 L.Ed. 1025 (1893); *Miller v. Premier Corp.,* 608 F.2d 973 (4th Cir.1979); *Southern Bell Telephone & Telegraph v. WRNO,* 216 S.C. 533, 59 S.E.2d 146 (1950); *Foxworth v. Murchison National Bank,* 134 S.E. 428 (S.C.1926). Furthermore, where a principal retains the benefits of a transaction entered into by its agent, the principal is deemed to have ratified the contract and may not later challenge certain provisions of the contract by claiming that the agent exceeded its authority. *Ouimette v. E.F. Hutton & Co., Inc.,* 740 F.2d 72 (1st Cir. 1984). *See Berman v. New Hampshire Jockey Club, Inc.,* 324 F.Supp. 1156 (D.N.H.1971); *Branch Banking & Trust Co. v. Gill,* 286 N.C. 342, 211 S.E.2d 327 (1975).

In short, the plaintiffs cannot retain the benefits of the rebate program and repudiate the burdens. Even assuming that Stabilization, as agent, overstepped its authority in implementing the rebate program, the plaintiffs have ratified the purchase contracts in their entirety by accepting and retaining their benefits. Consequently, the plaintiffs' claim for restitution fails.

The plaintiffs also allege that the Secretary and CCC failed to comply with the publication provisions of 7 *U.S.C.* § 1445(f)(3), the Freedom of Information Act ("FOIA"), and the Administrative Procedure Act ("APA"). These contentions, however, are without merit because none of these statutes apply.

■ Section 1445(f)(3) provides that "[b]efore establishing the support level ... for tobacco the Secretary shall publish in the Federal Register a notice of the level

the Secretary proposes to establish and give an opportunity for the public to comment on the proposal." The rebate program is distinct from the price support level. Therefore, as to the rebate program, the Secretary did not have to comply with the statute's publication requirement.

■ Similarly, the Secretary and CCC did not violate the FOIA publication requirement.[11] That requirement includes the following exception:

> Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

5 *U.S.C.* § 552(a)(1). Consequently, an unpublished agency action is effective as to persons who have actual notice. *See Conservation Law Foundation of New England v. Clark,* 590 F.Supp. 1467, 1475–76 (D.Mass.1984). The plaintiffs had actual notice through the press release issued by the Department of Agriculture on July 23, 1985. *See* Footnote 5, *supra.* Accordingly, the plaintiffs' actual notice of the rebate program precludes them from complaining that the plan should have been published in the Federal Register.

■ In addition, the Secretary and CCC did not contravene the publication requirement of the APA. 5 *U.S.C.* § 553. Section 553(b) provides as follows:

> General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or

---

agents for the conduct of the joint enterprise.... [T]he stockholders or members are essentially the principal or the "employer," and the officers and directors are simply their "employees" or agents to direct the business; the agents are subject to the control of their employers.'
*Id.* at 470–71 (emphasis in original) (*citing* U.S. D.A., Legal Phases of Cooperatives 12 (1976)). *See also,* N.C.Gen.Stat. § 54–151 (1982), under which Stabilization is organized; 7 *C.F.R.* § 1464.1 (Stabilization is "acting on behalf of ... producer members"). Stabilization also is an agent of the government, 7 *U.S.C.* § 1445-1(a).

11. The Freedom of Information Act provides: Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

 \* \* \* \* \* \*

 (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by each agency....
5 *U.S.C.* § 552(a)(1)(D).

otherwise have actual notice thereto in accordance with law.

As stated above, the plaintiffs had actual notice of the rebate plan. Moreover, the No Net Cost Act invokes the Secretary's discretion to ensure that the proposed use of the Fund is consistent with the No Net Cost Act's purpose, not rulemaking subject to the APA. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Vandermark v. Housing Authority of City of York,* 492 F.Supp. 359 (M.D.Pa.1980), *aff'd* 663 F.2d 436 (3d Cir.1981). Since the Secretary acted pursuant to 7 *U.S.C.* § 1445–1(d)(3) to authorize a particular proposal made by Stabilization and did not establish either a permanent rule or a rule affecting the public generally, no rulemaking procedures, including publication, were required.

The plaintiffs further allege that the defendants violated the antitrust laws by conspiring with one another to restrain trade, fix prices, and monopolize the tobacco market. It is well-settled, however, that the federal government and its agencies are immune from antitrust liability. *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986); *Sea-Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982); *Department of Water & Power of City of Los Angeles v. Bonneville Power Administration,* 759 F.2d 684 (9th Cir.1985); *Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672 (5th Cir.), *cert. denied,* 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968); *Stroud v. Benson,* 155 F.Supp. 482 (E.D.N.C.1957), *dismissed on other grounds,* 254 F.2d 448 (4th Cir.), *cert. denied,* 358 U.S. 817, 79 S.Ct. 28, 3 L.Ed.2d 59 (1958). In addition, private parties with whom the Government and its agencies deal are not subject to the antitrust laws. *Medical Association of State of Alabama v. Schweiker,* 554 F.Supp. 955 (M.D.Ala.), *aff'd sub nom., Medical Association of State of Alabama v. Heckler,* 714 F.2d 107 (11th Cir.1983). Consequently, all of the defendants are immune from the antitrust laws.

## CONCLUSION

As the foregoing discussion demonstrates, the plaintiffs lack standing to bring this action. Accordingly, the Court lacks subject matter jurisdiction and must dismiss this lawsuit pursuant to Rule 12(b)(1). Alternatively, the plaintiffs have failed to state a cause of action upon which relief can be granted for a variety of reasons and the Court must dismiss this action pursuant to Rule 12(b)(6).

IT IS, THEREFORE, ORDERED that the plaintiffs' action be and hereby is dismissed.

IT IS SO ORDERED.

## JUDGMENT

This action came on for hearing before the Court on motions of all remaining defendants to dismiss pursuant to *Fed.R.Civ.P.* Rules 12(b) (1) and (6). The issues having been heard, and defendants' motions to dismiss pursuant to Rules 12(b) (1) and (6) having been granted,

IT IS ORDERED AND ADJUDGED that the plaintiffs take nothing, that the action be dismissed on the merits, and that the defendants above-named recover of the plaintiffs above-named their costs of action.