**SECOND DIVISION**
**BARNES, P. J.,**
**MCFADDEN AND BOGGS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

July 16, 2012

# In the Court of Appeals of Georgia

A12A0527. CONTRACT FURNITURE REFINISHING & BO-083
    MAINTENANCE CORP. OF GEORGIA D/B/A THE
    REFINISHING TOUCH v. REMANUFACTURING &
    DESIGN GROUP, LLC et al.

BARNES, Presiding Judge.

Contract Furniture Refinishing & Maintenance Corp. of Georgia d/b/a The Refinishing Touch ("TRT") sued former employee Scott Deutsch for numerous claims, including misappropriation of trade secrets and unfair competition, and Deutsch counterclaimed for fraud and breach of contract. The trial court granted partial summary judgment to Deutsch, denied summary judgment to TRT on Deutsch's counterclaim, and granted Deutsch's motion to compel discovery. For the reasons explained below, we affirm in part and reverse in part.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant or denial of summary judgment, we apply a de novo standard of review, and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

So viewed, the record shows that in about 1984, Deutsch began working as a subcontractor for Contract Furniture Refinishing & Maintenance Corp., a furniture refinishing business incorporated in Ohio and run by Mario Insenga. In 1989, Insenga gave Deutsch 50 shares of stock in the company, which represented ten percent of the outstanding stock. Deutsch testified that Insenga "volunteered" to give him ten percent of the Ohio company "out of the blue" and "out of gratitude" because Deutsch sold a $900,000 project. He admitted that he made no specific promise to do anything in exchange for the interest, explaining, "He knew I was gonna do something. I did something every day. I didn't have to be asked to do it." Deutsch acknowledged that he knew the stock certificate was for the Ohio corporation, and that afterward Insenga incorporated TRT in Georgia.

After eight years as a subcontractor, in 1992, Deutsch entered into an employment agreement with TRT, under which he was paid 30 percent of the "gross proceeds" from any project he directed. "Two or three" years later, before the mid-1990s, his compensation changed to a base salary plus ten percent of any project he sold, and a year or two after that he began receiving only a base salary with no sales commissions. After he began receiving only a base salary, Deutsch began "pressing for an agreement, for a contract, something for that," because he wanted "[a] legal document showing ownership in the company," but Insenga refused to give him any kind of written document. Deutsch asserted that Insenga told him that his ten percent was still valid for the Georgia corporation and repeatedly told him for twenty years that he had "a ten percent interest in this company," which is why he "stuck around for 20 years." Deutsch admitted that he did nothing specific in exchange for an ownership interest, stating he "had already earned it and I continued to earn it every day." According to Deutsch, Insenga "wanted to keep [him] in the company. That was the bait. It worked."

Although Deutsch continued to ask Insenga to put their agreement in writing, Insenga refused. Deutsch acknowledged that he "didn't discuss shares" of the Georgia corporation with Insenga because "[a]t that point it was just a straight 10 percent of

3

the entire company, which at that point was a lot bigger than he and I and a one-room thing." Insenga never denied the agreement; instead, "[h]e would just get into a rage and storm off, yelling and screaming, and then the next time you saw him he would act like nothing happened."[1] According to Deutsch, Insenga said he did not want any written agreements for "banking reasons," because Deutsch's credit would hinder Insenga's ability to get a line of credit. Deutsch testified that Insenga would also become "mad because I didn't trust him" by asking for the agreement in writing.

In September 2008, John Ferguson suggested to Deutsch that they form their own business, and shortly thereafter, Deutsch met with an investor, Richard Craven, to discuss creating the business. On October 17, 2008, while Deutsch was still employed by TRT, Deutsch, Craven, and Ferguson signed an operating agreement for Remanufacturing & Design Group, LLC. ("RDG") Under this agreement, Deutsch, Craven, and Ferguson each owned one-third of the company. Deutsch admitted that he did not immediately resign from his employment with TRT or inform Insenga about the new company. Deutsch's role in the new company was to run operations beginning on October 17, 2008, and Ferguson was to handle sales. Four months later,

---

[1] Deutsch also described Insenga's reaction when asked about the ownership interest as "[y]elling and screaming, foaming, spittle coming out of his mouth, hitting things, flailing out of the room, driving off in his Porsche."

4

on February 18, 2009, Deutsch resigned from his employment with TRT and left his company-issued truck, cell-phone, laptop, and resignation letter, at the home of TRT's operations manager.

On April 7, 2009, TRT filed suit against Deutsch, raising multiple claims, and Deutsch counterclaimed, seeking damages for fraud, breach of contract, punitive damages, and attorney fees. Both parties subsequently moved for summary judgment. The trial court granted partial summary judgment to Deutsch on TRT's claims related to trade secrets, and denied summary judgment to TRT on Deutsch's counterclaims. Numerous claims against Deutsch remain pending.

1. TRT contends that the trial court should have granted it summary judgment on Deutsch's fraud and breach of contract claims because the terms of any agreement under which Deutsch would receive ten percent of the company were too indefinite to constitute a binding contract, and because the statute of limitation had run.

"Under Georgia law, a contract does not exist unless the parties agree upon all material terms. A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain. Thus, a court will not enforce an agreement where it is left to ascertain the intention of the parties by conjecture." (Citation, punctuation and footnote omitted.) *Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (1) (675

SE2d 598) (2009). In this case, TRT argues, the parties did not discuss the form of Deutsch'sownership, such as a percentage of profits or shares of stock. If his ownership was to consist of stock shares, TRT argues, the parties did not agree on the number and class of shares he would receive, whether they would come from the company or from Insenga, or address when the shares would be issued to Deutsch.

Regarding ownership interest in a corporation, this court has held that an oral promise to give a certain percentage of ownership interest in a company may be too indefinite to be enforced, such as when the corporate structure has not been determined or the source of the stock was not specified. *Massih v. Mulling*, 271 Ga. App. 685, 687 (1) (610 SE2d 657) (2005); *Key v. Naylor*, 268 Ga. App. 419, 425-426 (3) (602 SE2d 192) (2004). On the other hand, we have held that a written agreement to transfer a 25 percent equity interest in two subsidiary companies in exchange for the employee performing a specific job at a specific salary was sufficiently detailed to obligate the parent company to issue 25 percent of the subsidiaries' outstanding stock to the employee. *Kitchens*, 296 Ga. App. at 745 (1).

Assuming without deciding that Insenga's promise to give Deutsch ten percent of the company was definite and enforceable, however, Deutsch'scounterclaim is foreclosed by the running of the statute of limitation.

6

The applicable statute of limitation for an oral contract is four years. OCGA § 9-3-25. Deutsch testified that Insenga's promise of an interest in the company was "the bait" that kept him working for TRT for 20 years. He argues that "the stock was to be issued each time promised" and that the statute began running anew with each promise. Because Insenga had repeated his latest promise less than four years before Deutsch brought his counterclaim, Deutsch argues, the statute of limitation on his claim has not run.

"In determining whether the statute of limitation provides a bar to this action the court must decide when the statutory period began to run. [Deutsch's counterclaim] makes no reference to a date by which [Deutsch] was to receive such stock and . . . a corporation can issue stock at any time." *Palmer v. Neal*, 602 F. Supp. 882, 886 (N.D. Ga. 1984).

> It has been long recognized and is well established that a statute of limitation begins to run on the date a cause of action on a claim accrues. In other words, the period within which a suit may be brought is measured from the date upon which the plaintiff could have successfully maintained the action.

(Citation and punctuation omitted.) *Jankowski v. Taylor*, 246 Ga. 804, 805 (273 SE2d 16) (1980); see also *Kueffer Crane & Hoist Serv. v. Passarella*, 247 Ga. App. 327,

7

329 (2) (543 SE2d 113) (2000); *Leathers v. Timex Corp.*, 174 Ga. App. 430, 431 (2) (330 SE2d 102) (1985) (suit by former employee who alleged entitlement to certain retirement benefits under oral agreement barred by statute of limitation).

In *Kueffer Crane*, a former employee sought a declaratory judgment that he was a five percent owner of his former employer, contending that the company had induced him to come work for it seven years earlier by promising him the ownership. 247 Ga. App. at 329. The company paid him five percent of its profits for five years, but the next year the owner denied that the employee had any ownership interest and refused to pay him five percent of the profits. Id. In response to the employee's petition, the company argued that the statute of limitations began to run when it first refused the employee's request for stock certificates in 1992. Id. Noting that "one may have an ownership interest in a corporation without having received stock certificates," we held that the agreement was not breached until the company refused to pay the employee his profit share. Id. Because the employee filed suit within four years of the breach, his claim was not foreclosed by the running of the statute of limitation. Id. at 329-330.

In contrast, Deutsch asked Insenga for "[a] legal document showing ownership in the company" when he stopped receiving commissions and began receiving only

8

a base salary, which according to his testimony would have been in 1997 at the latest. Absent a specified time in the agreement about when Insenga was going to memorialize in writing Deutsch's ten percent interest in the company, Deutsch's right of action accrued either when Insenga first agreed to give Deutsch ten percent of the company, as was the case in *Palmer*, 602 F. Supp. at 886, or when Deutsch's compensation changed to only a base salary and Insenga refused to give him a written document of any kind. Under either scenario, Deutsch's breach of contract action is barred by the running of the four-year statute of limitation.

The statute of limitation being four years also for fraud claims, that cause of action is also barred. *Shapiro v. Southern Can Co.*, 185 Ga. App. 677 (365 SE2d 518) (1988). Accordingly, the trial court erred in denying summary judgment to TRT on both of Deutsch's counterclaims.

2. Based upon our holding in Division 1, we need not address whether Deutsch's fraud and breach of contract claims also fail because the agreement was too indefinite or lacked consideration, or that Deutsch did not justifiably rely on the promise.

3. Our holding in Division 1 also compels us to vacate the trial court's order granting Deutsch's motion to compel discovery about the value of TRT. *Santasiero*

9

*v. Abernathy*, 304 Ga. App. 569, 571 (1) (696 SE2d 352) (2010) (subpoena enforcement issue moot based upon lack of existing controversy between the parties following settlement). For the same reason, we also reverse the denial of summary judgment to TRT on Deutsch's derivative claims for punitive damages and attorney fees. *ULQ, LLC v. Meder*, 293 Ga. App. 176, 182 (4) (666 SE2d 713) (2008) (claims for punitive damages and attorney fees fail based upon grant of summary judgment on underlying liability claim).

4. In its remaining enumerations of error, TRT asserts that the trial court erred by granting summary judgment to Deutsch on its claims for misappropriation of trade secrets and breach of the confidentiality provisions of his employment contract with regard to trade secrets. The trial court granted summary judgment in Deutsch's favor based upon its conclusion that TRT "failed to establish it has trade secrets and further that it has failed to adequately protect as confidential the information Plaintiff considers trade secrets."

In its briefs to this court, TRT asserts that "the trade secrets alleged in this case are the several thousand pages of recaps provided to Deutsch" during his employment with TRT. In support of its claim for trade secret misappropriation, TRT points to two successful bids made by RDG (Comfort Inn, West Virginia and Doubletree, Ohio)

10

after TRT provided Deutsch with information about leads for the work. It also points to evidence regarding the connection of a flash drive between Deutsch's personal computer and his company-issued laptop the day before he resigned.

The custodian of records for TRT, Amy Parson, provided an affidavit in which she explained that during Deutsch's employment with TRT, he was provided with "Sales and Contracting Department Recap reports" as well as "Marketing Department Recap reports." According to Parson, the sales recap reports included "proprietary and trade secret information including a listing of [TRT]'s customers, customer contact information, customer leads, and customer quote amounts." The marketing recap reports contained "proprietary and trade secret information including a listing of [TRT]'s customers, customer contact information, new customer leads, and contact information for customer leads and prospective customers."

On September 19, 2008,[2] Parson sent an email to Deutsch that included a sales recap report for the week of September 15, 2008. This report included the following information about Comfort Inn Cross Lanes, West Virginia, a prospective customer: "the prospective customer name, the TRT proposal number assigned to the

---

[2] This was around the time that Deutsch first discussed starting his own business.

11

prospective customer, the contact person for the prospective customer, the type of project, information concerning the local area representative, the specific dollar amount of TRT's quote to the prospective customer and notes concerning the dates of communication of TRT's quote to the prospective customer." Deutsch was also provided access to the marketing recap report for the week of September 8, 2008. The listing for the Comfort Inn Cross Lanes, West Virginia included some of the same information as the September 19 report: "a listing of the prospective customer name, the contact name, phone number and email address of the prospective customer contact, the name of the owner of the prospective customer contact, the origination of the prospective customer lead, the type of project[,] and notes on communications and activity concerning the prospective customer lead."

TRT sent a proposal to the Comfort Inn Cross Lanes, West Virginia on September 17, 2008. On October 28, 2008, Deutsch's company newly formed company, RDG, sent a proposal to the same prospective customer that according to Insenga was "essentially the same as TRT's . . . except for the difference in unit price." At the time this proposal was sent, Deutsch was still employed by TRT. A couple of weeks after RDG bid on the job, Deutsch stopped by to look at the project and spoke with the general manager on RDG's behalf. According to Deutsch, the

client obtained six bids on the job and awarded it to RDG "because we're the only people who came by."

On February 6, 2009, Parson sent an email to Deutsch including the sales recap for the week that included information about a prospective customer, Doubletree Columbus, Ohio. A marketing recap report in early February 2009 also included information about this prospective customer. On February 5, 2009, TRT sent a proposal to this customer, and on February 26, 2009, RDG sent an identical proposal with a different unit price to the same prospective customer.

Finally, TRT inspected the TRT laptop returned by Deutsch after he resigned on February 18, 2009, and discovered that it had been "stripped of all of TRT's proprietary and trade secret files, including but not limited to emails sent to Deutsch during his employment containing TRT's listing of customers and prospective customers, TRT's job quotes, TRT's inventory lists, TRT's customer leads and TRT's pricing lists and pricing information." On February 24, 2009, TRT sent a letter to Deutsch demanding that he return "any and all of TRT's proprietary and trade secret computer data and documentation" by February 27, 2009. A computer forensics investigator examined the hard drive image of Deutsch's TRT laptop and Deutsch's personal laptop, apparently purchased by as early as February 5, 2009, and discovered

that a flash drive, a device often used to store and move files from one computer to another, had been first connected to both of these computers on February 17, 2009, the day before Deutsch resigned from TRT.

In his deposition, Deutsch testified that he did not retain hard copies of any recap reports provided to him during weekly meetings at TRT. He denied downloading or saving to his computer's hard drive any email attachments sent to him by TRT, copying any files from his laptop to a flash drive or CD, giving any TRT company information to anyone at RDG, disclosing TRT information to anyone unless it related to work he performed for TRT, or retaining or possessing any TRT information or paper files after he resigned from TRT on February 18, 2009.

With regard to the Comfort Inn Cross Lanes, West Virginia job, Deutsch testified that Ferguson obtained this job after "[w]e went on the Internet. I showed him how to look up purchasing companies, management companies, hotel companies, lists. He made cold calls, we sent letters, memos out in the field." Deutsch denied hearing about this hotel before Ferguson obtained the job, denied reading about leads in recap reports provided to him by TRT, and denied receiving any recap reports listing this hotel.

According to Ferguson, the Comfort Inn, West Virginia job was obtained by Ryan Jacobs, whom he described as Craven's representative with regard to Craven's ownership interest in RDG and to whom he was required to make weekly reports about his marketing efforts. Jacobs, on the other hand, testified that Ferguson first informed him of the Comfort Inn lead, but he did not know how he obtained it. Jacobs denied ever seeing a TRT bid for the same job, and explained that most of Ferguson's "leads come from email and online. There are also publications in the industry that will physically, in their magazines, print out lists of hotel owners, management . . . that sort of thing, so [the Comfort Inn lead] could have come from any of those."

With regard to the Doubletree, Columbus, Ohio bid, Jacobs testified that Deutsch contacted a manager for the owner after quitting his job with TRT, who then contacted Jacobs about providing a bid. According to Jacobs, the client provided Deutsch with a copy of TRT's bid by email, and the record includes a copy of this email.

Having reviewed the evidence supporting TRT's trade secret claims in the light most favorable to TRT, we must now determine whether this evidence presents any genuine issue of material fact. To recover under the Georgia Trade Secrets Act of 1990, OCGA § 10-1-760 et seq., TRT must demonstrate that its recap reports are a

15

trade secret as defined by OCGA § 10-1-761 (4) *and* that Deutsch misappropriated these trade secrets. *Hilb, Rogal & Hamilton Co. v. Holley*, 284 Ga. App. 591, 597 (4) (644 SE2d 862) (2007). Based upon our conclusion below that TRT has failed to demonstrate a genuine issue of material fact with regard to the misappropriation element of its claim,[3] we need not address whether the trial court erred by granting summary judgment in favor of Deutsch with regard to other elements of its trade secrets claims. *Rachels v. Thompson*, 290 Ga. App. 115, 117 (658 SE2d 890) (2008) (affirming grant of summary judgment under "right for any reason" rule).

OCGA § 10-1-761 (2) provides a definition of "misappropriation" for purposes of the Georgia Trade Secrets Act of 1990 and the only portion of this definition with potential application to the facts at issue here follows: "'Misappropriation' means . . . [d]isclosure or use of a trade secret of another without express or implied consent by a person who: . . . [a]t the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." OCGA § 10-1-761 (2) (B) (ii) (II).

---

[3] The record shows that Deutsch raised this ground in support of his motion for summary judgment in the trial court and that the issue was argued during the hearing on Deutsch's motion. Additionally, TRT addresses this alternative ground for summary judgment in its briefing to this court.

16

In this case, TRT presents only circumstantial evidence to support its allegation that Deutsch disclosed or used its trade secrets. Specifically, the timing of the recap reports that were provided to Deutsch compared to the timing of RDG's competitive bids to two customer leads included within the reports, as well as the timing of when a flash drive was connected to both Deutsch's personal laptop and TRT's laptop that was later missing data. Deutsch, on the other hand, testified unequivocally that he did not use or disclose any trade secrets provided to him by TRT, and presented evidence showing how RDG could have independently bid upon the Comfort Inn job and that the Doubletree client provided RDG with a copy of TRT's bid.

"In ruling on a motion for summary judgment, a finding of fact that may be inferred from, but is not demanded by, circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists, provided that the circumstantial evidence may be construed consistently with the direct evidence." *White v. Shamrock Bldg. Systems*, 294 Ga. App. 340, 344 (1) (669 SE2d 168) (2008). In this case, while TRT has produced strong circumstantial evidence that Deutsch may have used or disclosed its alleged trade secrets, this evidence is also consistent with the direct evidence that Deutsch did not in fact do so. The circumstantial evidence therefore has no probative value, and TRT cannot demonstrate a genuine

17

issue of fact with regard to its misappropriation of trade secrets claim. See *Wachovia Ins. Svcs. v. Fallon*, 299 Ga. App. 440, 446-447 (3) (c) (682 SE2d 657) (2009) (former employee entitled to summary judgment on misappropriation of trade secrets claims where record contained no evidence showing that former employee used alleged trade secrets in his subsequent competing business); *Stargate Software Intl. v. Rumph*, 224 Ga. App. 873, 877 (2) (482 SE2d 498) (1997) (affirming grant of summary judgment because record contained no evidence that defendant "actually provided source code to [plaintiff's client] or any other person"). Compare *Hilb*, supra, 284 Ga. App. at 597 (4) (finding issue of fact regarding misappropriation because former employee admitted using trade secret information after his resignation); *DeGiorgio v. Megabyte Intl.*, 266 Ga. 539 (1) (468 SE2d 367) (1996) (finding issues of fact on misappropriation where employer received complaints from top customers, who could not be identified through phone books or commercial lists, about former employee's activities).

Consequently, we affirm the trial court's partial grant of summary judgment to Deutsch on TRT's misappropriation of trade secrets claim whether premised upon a violation of the Georgia Trade Secrets Act of 1990 or breach of contract.[4]

*Judgment affirmed in part, reversed in part. McFadden, J., concurs. Boggs, J., concurs in judgment only.*

---

[4] TRT's breach of contract claim premised upon disclosure of trade secrets fails because it cannot prove a breach. Nothing in this opinion should be construed to rule upon the validity of TRT's remaining breach of contract claims unrelated to a claim for disclosure of trade secrets.