**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 28, 2014**

# In the Court of Appeals of Georgia

A13A1659. RIGBY et al. v. FLUE-CURED TOBACCO COOPERATIVE STABILIZATION CORPORATION.

MILLER, Judge.

Julian A. Rigby, Terry Altman, Elton Carter, Byron Carter, David H. Lee, and Bryan Aldridge (collectively, "the Plaintiffs") are tobacco farmers who were members of and sold their tobacco to Flue-Cured Tobacco Cooperative Stabilization Corporation, now known as the United States Tobacco Cooperative, Inc. (the "Tobacco Cooperative").[1] The Plaintiffs sued the Tobacco Cooperative for breach of contract, an accounting, and other claims relating to allegations that they were wrongfully stripped of their membership in the cooperative, were entitled to an accounting of the Tobacco Cooperative's capital reserve, stock certificates, and

---

[1]Wayne Lott was originally among the plaintiffs who brought suit, but the trial court dismissed his claims without prejudice pursuant to his motion.

dividends, and were denied the opportunity to sell their tobacco to marketing centers. The Plaintiffs appeal from the trial court's rulings dismissing some of their claims and granting summary judgment on their remaining claims. The Plaintiffs contend that the trial court erred in granting summary judgment to the Tobacco Cooperative on: their claim to be reinstated as members of the Tobacco Cooperative; their demand to be issued shares of the Tobacco Cooperative common stock; their claim for an accounting of the Tobacco Cooperative's capital account; their breach of contract claim concerning the Tobacco Cooperative's failure to provide them an opportunity to sell tobacco through its marketing facilities; and their claims relating to the Tobacco Cooperative's failure to pay them a pro-rata share of profits earned between the years 1967 and 1973. The Plaintiffs also contend that the trial court erred in dismissing their claim for breach of fiduciary duty and in granting summary judgment to the Tobacco Cooperative on their claim for attorney fees. For the reasons that follow, we affirm in part and reverse in part.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a [grant or] denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

2

(Citations and footnote omitted.) *GEICO Gen. Ins. Co. v. Wright*, 299 Ga. App. 280, 281 (682 SE2d 369) (2009).

So viewed, the evidence shows that the Tobacco Cooperative, a non-profit agricultural cooperative association, was organized in 1946 under North Carolina law for the purpose of engaging in business activities related to the marketing, selling, and distribution of flue-cured tobacco. Article VI of the Tobacco Cooperative's Articles of Incorporation ("Article VI") provides that common stock in the Tobacco Cooperative "may be purchased, owned or held by producers who shall patronize the corporation in accordance with uniform terms and conditions prescribed thereby and only such persons shall be regarded as eligible members of the corporation." Article VI also provides that no dividends shall be paid upon the common stock.

Among the Tobacco Cooperative's activities, it administered the federal minimum price support program offered to flue-cured tobacco farmers within portions of the Southeastern United States, including Georgia. The Tobacco Cooperative worked through the Commodity Credit Corporation ("CCC") and the United States Department of Agriculture ("USDA") to administer the federal tobacco price support program within the framework first created by the Agricultural Adjustment Act of 1938, which established a program of federal tobacco quotas and price supports

3

aimed at stabilizing and increasing the prices paid to America's tobacco growers. 7 U.S.C §§ 1281 et seq.

In brief, the USDA annually set the minimum price for flue-cured tobacco, and the payment for tobacco was funded through loans that the Tobacco Cooperative received from the CCC. The Tobacco Cooperative used the loans to purchase eligible tobacco that served as collateral for the CCC loans. The Tobacco Cooperative then processed and stored the tobacco, and later attempted to resell it at a price sufficient to repay or reduce the CCC loans. When the Tobacco Cooperative realized more from the sale of a particular tobacco crop than necessary to repay the CCC loans and recover its costs, the tobacco growers who produced that particular crop received a portion of the surplus, or net gain. When the proceeds from the sale of a particular crop were insufficient to repay the CCC loans, however, the losses were absorbed by the federal government.[2]

---

[2] In 1982, Congress significantly amended the price support program to relieve taxpayers of the cost of the price support program by limiting federal tobacco expenditures and requiring any net gains realized by tobacco cooperatives to be retained by the CCC in order to offset any losses incurred on tobacco loans. See *Leaf Tobacco Exporters Assn., Inc. v. Block*, 749 F.2d 1106, 1108-1110 (I) - (II) (4th Cir. 1984) (describing the price support program); *Strickland v. Flue-Cured Tobacco Cooperative Stabilization Corp.*, 643 F.Supp. 310, 313 (D.S.C. 1986) (same).

The Plaintiffs, all flue-cured tobacco farmers, applied for and received the Tobacco Cooperative stock in exchange for a $5 capital contribution. In particular, the Tobacco Cooperative records show that Rigby applied for and received a share of common stock in 1982; Altman in 1979; Elton Carter in 1955; Byron Carter in 1993; Lee in 1970; and Aldridge in 1993. Rigby and Byron Carter testified, however, that they did not actually receive their certificates reflecting the purchase of common stock.

The Plaintiffs sold tobacco to the Tobacco Cooperative from time to time as part of the minimum federal price support program. Specifically, between 1967 and 1973, Rigby, Lee, and Elton Carter sold tobacco to the Tobacco Cooperative as a part of the federal minimum price support program. During these years, and for only these years, the Tobacco Cooperative realized a net gain from the tobacco it sold. The Tobacco Cooperative distributed a portion of the net gain to farmers, including $291.15 to Elton Carter and $6.40 to Lee, and issued certificates of interest to the farmers for the undistributed portion of the net gain, which was valued at approximately $26.8 million. In 1975, the Tobacco Cooperative's board of directors set aside the undistributed net gain into its capital reserve, and it notified members of the decision through a newsletter. As provided by Article XI of the Tobacco

Cooperative's Articles of Incorporation, as amended, ("Article XI") the certificates of interest "carry no rights of dividend, interest or other income or appreciation," and the certificates are redeemable "only upon such terms and at such times as may be determined from time to time by the Board of Directors." Furthermore, Article XI further provided that the "death, withdrawal or expulsion of a member shall not give rise to any right to receive any payment from the capital reserve[.]"

The evidence shows that most of the Plaintiffs stopped patronizing the cooperative by 2001. Altman deposed that he stopped selling tobacco to the Tobacco Cooperative sometime in 2003 or 2004.

In 2004, the federal government ended the minimum price support program with passage of the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"). Around the same time, the Tobacco Cooperative bought a processing and manufacturing facility and entered into an agreement to supply a third-party who would distribute cigarettes under a brand to be developed by the Tobacco Cooperative. In December 2004, the Tobacco Cooperative sent a letter to flue-cured tobacco farmers informing them that it would be manufacturing cigarettes and offering farmers the opportunity to enter into an exclusive marketing agreement with the Tobacco Cooperative. The letter instructed farmers that only persons or entities

6

that signed the exclusive marketing agreement would be able to retain membership in the Tobacco Cooperative for 2005. The letter also instructed that any farmer who does not sign the agreement may elect to have his common stock redeemed at par value, or $5.00. Additionally, citing to its Article XI, the Tobacco Cooperative informed farmers that, if they chose to withdraw their membership by not signing the agreement, they were not entitled to a share of capital reserves by virtue of such withdrawal. The Tobacco Cooperative also informed farmers, however, that if they decided not to enter into an exclusive agreement for 2005, they would not be precluded from entering into future marketing agreements, provided the Tobacco Cooperative offered such agreements. Specifically, the Tobacco Cooperative told farmers that

> if you elect not to retain your membership for 2005, you would not be precluded from becoming a member in a subsequent year. As long as this proposed program continues, [the Tobacco Cooperative] membership will be open to all former tobacco farmers who are willing to sign an exclusive agreement with [the Tobacco Cooperative] and abide by the uniform terms and conditions set forth in the marketing agreement.

In 2007, the Plaintiffs filed their initial complaint against the Tobacco Cooperative, alleging that they were entitled to: an accounting of the Tobacco Cooperative's capital account and contributions made by the Plaintiffs (Count 1); a

distribution of reserved capital (Count 2); and specific performance to reinstate them as members of the cooperative by issuing their respective stock certificates (Count 3). The Plaintiffs also raised claims of breach of contract for denying the Plaintiffs the opportunity to enter into exclusive marketing agreements with the Tobacco Cooperative (Count 4); breach of fiduciary duty against the Tobacco Cooperative's Director (Count 5); and for attorney fees (Count 6).

Count 5 was subsequently dismissed pursuant to the parties' joint stipulation. Thereafter, in an order dated June 15, 2012, the trial court granted summary judgment to the Tobacco Cooperative on Counts 2, 4, 5, and 6.[3] The Plaintiffs then amended their complaint, as revised, to add three additional counts: Count 7 for breach of contract for failing to pay dividends from 1967 through 1973; Count 8 for breach of a loan warranty to distribute net gains from the sale of tobacco; and Count 9 for breach of fiduciary duty. The amended complaint also sought a declaratory judgment on the issue of the Plaintiffs' membership status in the Tobacco Cooperative (Count 1).

---

[3] The trial court also dismissed Rigby's amended Counts 1 and 2, but he does not challenge the dismissal of these amended counts on appeal.

8

In an order dated October 18, 2012, the trial court dismissed Count 1 to the extent it sought a declaration that the Tobacco Cooperative's corporate reserves belonged to the Plaintiffs or that such reserves should be paid to the Plaintiffs. The trial court also dismissed Count 9 on the grounds that the Tobacco Cooperative did not owe a fiduciary duty to its shareholders or members. The trial court subsequently granted summary judgment to the Tobacco Cooperative on the remaining claims and denied the Plaintiffs' motion for partial summary judgment. In granting summary judgement to the Tobacco Cooperative, the trial court found that: the court was not the proper forum to assert an accounting claim (Count 1); the Tobacco Cooperative was entitled to summary judgment on the Plaintiffs' prayer for Declaratory Judgment (Count 1) because the Plaintiffs were no longer members of the Tobacco Cooperative due to their own decision not to patronize the cooperative; the Plaintiffs were issued a share of stock and, therefore, the Tobacco Cooperative was entitled to summary judgment on the claim for specific performance (Count 3); and the Plaintiffs' claims for breach of contract, conversion, and money had and received for failing to pay

9

profits for the years 1967 through 1973 (Count 7) were time-barred.[4] This appeal ensued.

1. The Plaintiffs contend that the trial court erred in granting summary judgment on their claim to be recognized as members of the Tobacco Cooperative under Count 1, because they claimed that the cooperative's by-laws provide that revocation of membership can only be authorized following a hearing, which had not occurred in this case. The Plaintiffs' argument has no merit.

There is no dispute that in 2003, the Tobacco Cooperative purged inactive members from its membership rolls, and that it did so without a hearing. In support of their argument that they were entitled to a hearing before being purged from the membership roll, the Plaintiffs rely upon Article X of the Tobacco Cooperative's by-laws, which is virtually identical to Article VI of the cooperative's Articles of Incorporation. Those provisions provided that common stock

> may be purchased, owned or held by producers who shall patronize the corporation in accordance with uniform terms and conditions prescribed thereby and only such persons shall be regarded as eligible members of the corporation. *In the event the board of directors of the corporation shall find following a hearing* that any of the common stock has come

---

[4] The trial court also granted summary judgment to the Tobacco Cooperative on Count 8 – breach of loan warranty – and the Plaintiffs do not challenge the grant of summary judgment as to this count.

into the hands of any person who is not an eligible member, or that the holder thereof has ceased to be an eligible member, such person shall have no rights or privileges on account of such stock or vote or voice in the management or affairs of the corporation . . . and the corporation shall have the right (a) to purchase such stock at its book or par value, whichever is less, as determined by the board of directors . . . , and on the failure of the holder to deliver the certificate or certificates evidencing such stock, the corporation may cancel the same on its books, or (b) to require the transfer of any stock at such book or par value to any person eligible to hold the same and on the failure of the holder to deliver the certificate or certificates evidencing such stock, the corporation may cancel the same on its books and issue a new certificate or certificates in lieu thereof to any such person.

(Emphasis supplied.)

Contrary to the Plaintiffs' reading of these provisions, the plain language provides that the Tobacco Cooperative is only required to hold a hearing for the purposes of determining whether common stock is held by an eligible member so that, in the event the stock is not, the board of directors have the right to purchase or transfer the stock held by an ineligible member. By the unambiguous terms of Article VI of the Articles of Incorporation and Article X of the By-laws, the Plaintiffs were not to be regarded as eligible members of the Tobacco Cooperative because they did not patronize the corporation. There is no evidence that the Tobacco Cooperative has attempted to purchase or transfer any of stock belonging to these inactive members.

11

Therefore, the Tobacco Cooperative was not required to hold a hearing, and the Plaintiffs' claim on this ground fails.

2. The Plaintiffs also contend that the trial court erred in granting summary judgment on their claim for specific performance because the Tobacco Cooperative's by-laws require that each member be issued a stock certificate, they presented evidence that they did not receive the common stock certificate for which they paid, and the issuance of a stock certificate would reflect their membership status. We disagree.

As a preliminary matter, the Plaintiffs do not challenge the Tobacco Cooperative's records showing that they applied and paid $5 for a share of common stock. Instead, Rigby, Byron Carter, Elton Carter, and Lee claim that they did not actually receive the stock. Upon examining their testimony, however, Rigby and Byron Carter testified only that they did not receive the stock certificates. Elton Carter, through his wife Donna Carter, testified that he received the stock certificates. Lee similarly testified that stock certificates were issued, although he did not know where his were located.

Although Rigby and Byron Carter presented evidence that they did not receive a stock certificate, they presented no evidence to refute the Tobacco Cooperative's

12

evidence that they were actually issued common stock. Moreover, the Plaintiffs point to no requirement that the Tobacco Cooperative had to actually issue stock certificates. "[O]ne who has subscribed and paid for corporate stock is entitled to all the rights and responsibilities of ownership, whether the stock certificates have been issued to him or not." *Haas v. Koskey*, 138 Ga. App. 448, 453 (2) (226 SE2d 279) (1976). See also *First Jewelers, Inc. v. Rosen*, 119 Ga. App. 355, 356 (166 SE2d 919) (1969). Therefore, the trial court correctly held that there were no issues of fact regarding whether the Tobacco Cooperative issued stock to the Plaintiffs, and it properly granted summary judgment on this claim.

Even if the issuance of stock certificates was a question of fact, we may nevertheless affirm the trial court's grant of summary judgment if it is right for any reason, whether stated or unstated, so long as the legal basis was fairly presented in the court below. See *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013); *Bailey v. Hall*, 267 Ga. App. 222, 223, n. 1 (599 SE2d 226) (2004).

The Tobacco Cooperative argued before the trial court that the Plaintiffs' specific performance claim was time barred under the statute of limitation. While the statute of limitations for simple contracts is six years, see OCGA § 9-3-24, the statute

of limitation for equity suits, such as a claim for specific performance, is seven years.[5]

See *Knight v. Dept. of Transp.*, 239 Ga. 368, 370 (3) (236 SE2d 826) (1977); *Ellis v. Stanford*, 256 Ga. App. 294, 297 (4) (568 SE2d 157) (2002) (a claim for specific performance lies in equity). In this case, Rigby testified that he last applied for common stock in the 1990s. Byron Carter applied for common stock in 1993. Since the instant lawsuit was filed in 2007, well after the applicable limitation period ran, the claim for specific performance is barred. See *Knight*, supra, 239 Ga. at 370 (3) (equitable petition for cancellation of the deed brought more than seven years after execution of deed was barred by statute of limitation). Cf. *Contract Furniture Refinishing & Maint. Corp. of Georgia v. Remanufacturing & Design Grp., LLC*, 317 Ga. App. 47, 51 (730 SE2d 708) (2012) (providing that breach of contract claim was barred by six-year statute of limitation where cause of action for providing proof of ownership in company accrued either at time defendant first agreed to give plaintiff

---

[5]Although the Tobacco Cooperative was incorporated in North Carolina, "the general rule in Georgia is that statutes of limitation are procedural in nature and are therefore governed by the law of the forum state. . . . The Supreme Court of Georgia has held that a foreign state's law cannot extend the Georgia limitation period." (Citations and punctuation omitted.) *Butts v. Thomas*, 300 Ga. App. 639, 640 (686 SE2d 262) (2009).

a share of company or refused to give written document reflecting proof of ownership).

3. The Plaintiffs also contend that the trial court erred in concluding that it was not the proper forum for a claim for accounting. Specifically, the Plaintiffs argue that the Tobacco Cooperative's by-laws authorize members to inspect the corporation's records. The Plaintiff's claims are without merit.

Under OCGA § 14-3-1604 (a),

[i]f a corporation does not allow a member who complies with subsection (b) of Code Section 14-3-1602[6] to inspect and copy any records required by that subsection to be available for inspection, the superior court may summarily order inspection and copying of the records demanded at the corporation's expense upon application of the member.

A "corporation" is defined as "a nonprofit corporation, other than a foreign corporation, incorporated under or subject to the provisions of this chapter." OCGA § 14-3-140 (6); see also OCGA § 14-2-140 (4) (similarly providing that a for-profit corporation does not include a foreign corporation). It is undisputed that the Tobacco Cooperative is a foreign corporation organized under North Carolina law, and

[6] OCGA § 14-2-1602 (b) provides that the member is entitled to inspect the corporations's records if the member gives a written notice or written demand at least five business days before the date on which the member wishes to inspect the records.

therefore the trial court lacked the authority to order an inspection of the Tobacco Cooperative's records.

Moreover, an equitable claim for accounting will not lie where an adequate remedy is available at law. See *Faircloth v. A.L. Williams & Assoc., Inc.*, 219 Ga. App. 560, 560 (1) (465 SE2d 722) (1995). North Carolina provides a statutory scheme similar to Georgia's that allows members to obtain a court-ordered inspection of a non-profit corporation's records if the corporation does not accommodate a member's request. See NCGSA § 55A-16-04 (a). Consequently, the trial court correctly held that the accounting claim against the Tobacco Cooperative could not be asserted in Georgia.[7]

4. Plaintiffs Rigby and Aldridge contend that the trial court erred in granting summary judgment on their breach of contract claim based upon the allegation that the Tobacco Cooperative denied them the opportunity to sell tobacco despite their election to enter into an exclusive agreement. We disagree.

---

[7] It would appear that the Plaintiffs' claims are moot given that the trial court did order the Tobacco Cooperative to allow the Plaintiffs to inspect the corporate records, and the Plaintiffs have received voluminous corporate records regarding their accounts during discovery in this case.

16

As noted by the trial court, there is no evidence that Rigby and Aldridge entered into an exclusive agreement with the Tobacco Cooperative. Notably, Rigby testified that he responded to the Tobacco Cooperative's December 2004 letter regarding the ability to enter into an exclusive marketing agreement by completing a form letter expressing his interest in entering into such an agreement. Rigby did not actually sign the exclusive agreement, however, but claims that the Tobacco Cooperative refused to enter into a contract with him because he had a receiving station for a major tobacco company. Aldridge testified that when the federal price support program ended in 2004, he did not consider selling to the Tobacco Cooperative because he thought it was a "thing of the past." Aldridge further stated that it was not until 2008 or 2009 that he completed an application to enter into an exclusive agreement with the Tobacco Cooperative, but nothing ever materialized.

While Rigby and Aldridge argue that the Tobacco Cooperative's December 2004 letter constituted an offer and that they accepted the offer, the letter provides that farmers are required to *sign* the exclusive agreement. An "offer must be accepted in the manner specified by it; and if it calls for a promise, then a promise must be made; or if it calls for an act, it can be accepted only by the doing of the act." (Citation and punctuation omitted.) *Moreno v. Strickland*, 255 Ga. App. 850, 853 (1)

17

(567 SE2d 90) (2002); *Carterosa, Ltd. v. General Star Indem. Co.*, 227 Ga. App. 246, 248 (1) (489 SE2d 83) (1997) ("the offeror may specify a method through which the offer must be accepted"). Although the Tobacco Cooperative's December 2004 letter may have contained some terms to be included in a final agreement, there was no binding contract until the exclusive agreement was signed. Since neither Rigby nor Aldridge signed the exclusive agreement, the trial court did not err in granting summary judgment to the Tobacco Cooperative on this claim. See *Overton Apparel, Inc. v. Russell Corp.*, 264 Ga. App. 306, 310 (2) (590 SE2d 260) (2003) (although letter of intent contained some terms to be included in final agreement, it was only an agreement to agree, which was not enforceable).

5. The Plaintiffs also contend that the trial court erred in concluding that the applicable statutes of limitation barred their claims for breach of contract, conversion, and money had and received arising from the Tobacco Cooperative's failure to pay all amounts owed to them for the sale of tobacco from 1967 to 1973 (Count 7). We disagree.

Since Rigby, Elton Carter, and Lee were the only plaintiffs who sold tobacco to the Tobacco Cooperative from 1967 to 1973, these claims apply only to these plaintiffs.

18

(a) Breach of Contract

Plaintiffs Rigby, Elton Carter, and Lee argue that the Tobacco Cooperative was required to pay them a pro-rata share of the net gains realized for crop years 1967 to 1973. These plaintiffs cite to an "agreement and receipt" received upon selling tobacco to the Tobacco Cooperative that provided that

> in addition to the amount paid to the grower upon delivery of tobacco, [the Tobacco Cooperative] will distribute to him his pro-rata share of any net gains *remaining* after payment of operating and maintenance costs and expenses and a reasonable deduction for reserves as determined by the Board of Directors.

(Emphasis added.)

In this case, it is undisputed that the Tobacco Cooperative only realized net gains for crop years 1967 through 1973. It is further undisputed that the Tobacco Cooperative paid farmers a portion of the net gains for those years and, in 1975, set aside the remainder into a capital reserve. Contrary to the Plaintiffs' arguments, "the statute of limitation runs from the time the contract is broken rather than from the time the actual damage results or is ascertained." (Footnote omitted.) *Hamburger v. PFM Capital Mgmt., Inc.*, 286 Ga. App. 382, 385 (1) (649 SE2d 779) (2007).

Based upon the unambiguous language in the agreement as set forth above, there were no *remaining net gains* after the Tobacco Cooperative placed the

19

undistributed net gains from 1967 to 1973 into a capital reserve. The farmers' claims that they were entitled to an additional pro-rata share of the undistributed net gains accrued in 1975 when the Tobacco Cooperative placed any remaining money belonging to the farmers into a capital reserve and issued certificates of interest that created a separate agreement for the distribution of funds. As a result, the six-year statute of limitation has long since expired, and the plaintiffs' breach of contract claim is time-barred.[8]

(b) Conversion

OCGA § 9-3-32 provides that "[a]ctions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action accrues." A right of action for wrongful conversion accrues on the date of the conversion. See *Logan v. Tucker*, 224 Ga. App. 404, 406 (2) (480 SE2d 860) (1997). Here, any conversion of a farmer's pro-rata share of net

---

[8] Without legal or factual support, Rigby, Elton Carter, and Lee argue that the statute of limitation period did not commence until the end of the federal price support program in 2004. As discussed above, in 1982, the federal government amended the price support program to no longer allow tobacco cooperatives to retain net gains and, instead, those net gains were to be retained by the CCC. If there were any net gains remaining as of 1982, which there were none as discussed above, then the Plaintiffs' right to these net gains would have been in jeopardy no later than 1982. Consequently, to the extent the Plaintiffs rely upon any changes to the price support program, the statutes of limitation on their claims has long since passed.

20

gains for crop years 1967 through 1973 occurred in 1975, when the Tobacco Cooperative set aside the undistributed net gain into its capital reserve. Consequently, the conversion claim was also time-barred.

(c) Claim for "Money Had and Received"

Rigby, Elton Carter, and Lee also argue that their claim was essentially one for "money had and received."[9] These plaintiffs further argue that the four-year statute of limitation applicable to such a claim did not commence until a demand for money should have been made, which the plaintiffs assert was 2004 when the Tobacco Cooperative was forced to reinvent itself following the termination of the federal price support program.

A cause of action for money had and received is appropriate "where one wrongfully receives and retains the money of another." *J.C. Penney Co. v. West*, 140 Ga. App. 110, 112 (2) (230 SE2d 66) (1976). Contrary to the Plaintiffs' arguments, the four-year statute of limitation for a money had and received claim began to run on the date the claim could first be successfully maintained. See *Macomber v. First Union Nat. Bank of Ga.*, 212 Ga. App. 57, 58 (1), 59 (2) (441 SE2d 276) (1994). As

---

[9] Although the Tobacco Cooperative argues that the Plaintiffs cannot raise this claim for the first time on appeal, the record shows that the Plaintiffs raised this claim below.

demonstrated above, the Tobacco Cooperative placed the undistributed net gains into a capital reserve in 1975 and, therefore, it has had the unpaid portion of the farmers' pro-rata shares of the net gains since that time. The Plaintiffs could have maintained a cause of action starting in 1975. Therefore, their 2007 claim for money had and received was brought outside the statute of limitation.[10]

6. The Plaintiffs next contend that the trial court erred in dismissing their claim for breach of fiduciary duty (Count 9) on the grounds that a corporation owes no fiduciary duty to its members. We agree.

To properly analyze the Plaintiffs' claim, we must apply the lex loci delicti rule, which provides that "a tort action is governed by the substantive law of the state where the tort was committed." *Dowis v. Mud Slingers*, 279 Ga. 808, 809, 816 (621 SE2d 413) (2005). The Plaintiffs alleged that the Tobacco Cooperative breached its fiduciary duty by, among other things, revoking their membership, withholding distributions, preventing them from inspecting corporate records, and failing to

---

[10] We note that at oral argument, the Tobacco Cooperative confirmed that, in the future, the farmers holding certificates of interest might receive a pro-rata share of the undistributed portion of the net gains from 1967 to 1973. Such farmers cannot compel the Tobacco Cooperative to issue a distribution, however, because Article XI provides that the certificates of interest are redeemable "only upon such terms and at such times as may be determined from time to time by the Board of Directors."

22

provide them with contracts. Therefore, if a breach of fiduciary duty was committed, it was committed in North Carolina.

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651 (548 SE2d 704) (2001) (citations omitted). "Generally, the existence or nonexistence of a fiduciary duty is a question of fact for the jury." (Citation and punctuation omitted.) *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C. App. 663, 665 (391 SE2d 831) (1990).

"Under North Carolina law, directors of a corporation generally owe a fiduciary duty to the corporation, and where it is alleged that directors have breached this duty, the action is properly maintained by the corporation rather than any individual creditor or stockholder." *Keener Lumber Co., Inc. v. Perry*, 149 N.C. App. 19, 26 (I) (560 SE2d 817) (2002). Thus, the directors of a corporation owe a fiduciary duty to the company, and not to individual members. See *Kaplan v. O.K. Technologies, L.L.C.*, 196 N.C. App. 469, 474 (II) (A) (i) (675 SE2d 133) (2009). Notwithstanding these general rules, North Carolina law has broadly defined a fiduciary relationship in order to allow imposition of fiduciary duties where justified based on the

circumstances. See *Austin Maint. & Const., Inc. v. Crowder Const. Co.*, 742 SE2d 535, 541 (II) (B) (N.C. Ct. App. 2012).

The Tobacco Cooperative cites this Court's decision in *ULQ, LLC v. Meder*, 293 Ga. App. 176, 180-181 (2) (666 SE2d 713) (2008), which held that, under Georgia law, a corporation does not have a fiduciary relationship with stockholders. While the reasoning of *Meder* is very persuasive, we decline to extend it to North Carolina law in light of the North Carolina Supreme Court's opinion in *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588-590 (II) (403 SE2d 483) (1991), which affirmed a jury's determination that an incorporated North Carolina agricultural cooperative owed a fiduciary duty to its members based on the circumstances of the case. While the Tobacco Cooperative argues that those circumstances are not present in this case, we note that, similar to the circumstances here, *HAJMM* involved certificates in a revolving fund that arguably gave members an equity interest in the corporation and, as a result, led to the creation of a fiduciary relationship. Id. at 590 (II). As a result, we cannot conclude that some of the Plaintiffs could not establish a fiduciary relationship in this case. Accordingly, the trial court erred in determining that the Tobacco Cooperative owed no fiduciary duty to the Plaintiffs.

24

The Tobacco Cooperative nevertheless submits that we should affirm the trial court's judgment because "many, if not all," of the Plaintiffs' breach of fiduciary duty claims are barred by the statute of limitation. The Tobacco Cooperative's statement reveals that there are questions of fact remaining as to whether these claims would be time-barred. Moreover, the Plaintiffs' breach of fiduciary claim was based on several grounds, including some that occurred during discovery after the filing of the original complaint. Therefore, in the exercise of our discretion, we decline to reach the merits of the Tobacco Cooperative's statute-of-limitation defense and elect to return the case to the trial court for consideration of the issue. See *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002) (holding that this Court has the discretion to affirm under the "right for any reason" rule or remand for the trial court to consider an issue not addressed below).

7. The Plaintiffs also contend that the trial court erred in granting summary judgment on its claim for attorney fees and expenses of litigation because the Tobacco Cooperative acted in bad faith, was stubbornly litigious, and caused them unnecessary trouble and expense. We disagree.

OCGA § 13-6-11 authorizes a jury to award plaintiffs the expenses of litigation "where the defendant has acted in bad faith, has been stubbornly litigious, or has

25

caused the plaintiff[s] unnecessary trouble and expense." Generally, it is for the jury to resolve these questions. See *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (1) (622 SE2d 481) (2005). However, if there is no evidence of bad faith or stubborn litigiousness, a trial court should grant a defendant's motion for summary judgment on a claim for attorney fees. See *Garrett v. Women's Health Care of Gwinnett, P.C.*, 243 Ga. App. 53, 55 (1) (532 SE2d 164) (2000).

In this case, the Plaintiffs asked for attorney fees in Count 6 for having to file suit to enforce their contractual rights of membership and to enforce other rights as set out by the Tobacco Cooperative's by-laws and purchase agreements. The Plaintiffs also asked for attorney fees as a part of their claim for breach of fiduciary duties as specified in Count 9.

With respect to Count 6, which sought attorney fees for enforcing contract rights, we have upheld the grant of summary judgment in favor of the Tobacco Cooperative on these contractual claims. Consequently, the Plaintiffs' claim for attorney fees in Count 6 fails as a matter of law. See *United Companies Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996); *Monterrey Mexican Restaurant of Wise, Inc. v. Leon*, 282 Ga. App. 439, 453 (6) (d) (638 SE2d 879) (2006) (attorney fees under OCGA § 13-6-11 can only be awarded on the claims on

26

which the plaintiff prevailed). As to attorney fees for Count 9, we have held that a jury question remains as to this claim, and consequently, the Plaintiffs might be entitled to attorney fees with respect to their breach of fiduciary duty claim.

In sum, we affirm the trial court's ruling on all of the Plaintiffs' claims, with the exception of its ruling on the breach of fiduciary claim and any attendant attorney fees as set out in Count 9.

*Judgment affirmed in part; reversed in part. Barnes, P. J., concurs. Ray, J., concurs fully in Divisions 1, 2, 3, 4, and 6, and concurs dubitante in judgment only in Divisions 5 and 7.*